**In re GRAYHALL RESOURCES, INC., Debtor.**

**Bankruptcy No. 86 B 3547 E.**

United States Bankruptcy Court, D. Colorado.

July 18, 1986.

Michael H. Bynum, Kyle B. Usrey, Boulder; Colo., for Grayhall Resources, Inc.

Munsel St. Clair, Denver, Colo., Robert T. Cummins, Helena, Mont., for Judith Gold Corp.

## MEMORANDUM OPINION AND ORDER

CHARLES E. MATHESON, Bankruptcy Judge.

THIS MATTER came on for hearing on the application of Grayhall Resources, Inc. ("Debtor") to assume a certain mining lease entered into by a predecessor in interest of the Debtor with Judith Gold Corporation ("Judith Gold", or "Lessor"). Pursuant to the terms of the lease, the Lessee was granted a lease of the surface and subsurface and all minerals, except oil, gas and coal, contained in certain load mining claims located in the State of Montana which were owned by Judith Gold. The lease which was entered into on June 9, 1981, has a basic term of ten years and continues thereafter so long as minerals in a "substantial amount" are produced by the Lessee from the leased premises. Under the lease, the Debtor, as the assignee of the original Lessee's interest, has the right to the exclusive possession and control of the mining property, together with the right to develop, work, and mine and extract and remove the ores and minerals from the property.

Under the lease, the Lessee has sole discretion concerning the conduct of mining operations. There are no obligations imposed under the lease on the Lessee to mine the property. However, the Lessee must pay fixed advance royalty payments on a periodic basis and must, as well, pay a royalty based on actual production. In addition, the Lessee is required to expend "in the working and development of the property" $100,000 during the calendar year 1981, and $200,000 each year thereafter during the term of the lease for any year in which production royalties do not exceed the amount of the fixed advance minimum royalty. Amounts expended for "working and development" are cumulative and carryover from year to year so that for example, out of an expenditure of $400,000 in one year, $200,000 can be carried forward as a credit against the next year's work.

The lease gives to the Lessor the right to inspect the property from time to time, and the Lessee is to furnish the Lessor with copies of maps and information concerning the mining activities. The Lessor is also to be notified and allowed to be present when free gold is gathered by the Lessee. There are other covenants in the lease for the protection of the Lessor, such as:

a. The Lessee is required to pay all property taxes.

b. The Lessee must comply with state and federal laws "relating to the Lessee's operations" and must save "Lessor harmless from any claims for damages or liability" by reason of violations of such laws or regulations.

c. The Lessee must conduct its work in a "good workmanlike and minerlike manner, so as to develop said properties as a mine for permanent future mining operations" and all of such work is to be at the sole cost of the Lessee "without cost, charge, liability or expense to Lessor or to said properties."

d. The Lessee must keep the property free of liens; however, if mechanics liens do attach, the existence of such liens does not constitute a default if the Lessee, in good faith, disputes the validity of the lien claim in which event the existence of the lien does not constitute a default until such time as the validity of the lien has been affirmatively adjudicated.

e. The Lessee is required to "indemnify and save the Lessor harmless" from any suit which may be brought charging air or stream pollution or other environmental damage.

The failure of the Lessee to perform its obligations can result in the termination of the lease at the election of the Lessor. However, written notice must be provided to the Lessee, which notice must specify the particular default or defaults relied upon for termination, and the Lessee has thirty (30) days after receipt of such notice to cure the default. The Lessee has the right to terminate the lease at any time upon thirty (30) days written notice, but such termination does not release the Lessee from any obligations or liabilities theretofore incurred by him under the terms of the lease. Finally, the Lessee is free to assign the lease to another party or parties, but such assignment is to be effective only upon written notice to the Lessor.

The Debtor herein failed to pay the quarterly royalty payment which was due for the second quarter of 1986 in the amount of $3,337.06, and the Lessor gave notice of such failure and of its election to terminate. The nonpayment of the royalty was the only specified event of default. Within thirty days of the giving of the notice the Debtor filed this Chapter 11 proceeding, thereby staying the termination of the lease.

The mining lease and the related mining equipment are the only assets of any significance owned by the Debtor. Without the lease the Debtor has no prospects for reorganization and no basis upon which to finance its operations or the repayment of its creditors. Accordingly, the Debtor gave notice of its intention to assume the lease. The Lessor objected to the assumption and, in filing its objection, raised a series of purported defaults which had not previously been asserted.

The Debtor does not dispute the fact that it failed to pay the second quarter advance royalty payment when due. Thus, the lease was in default when the Chapter 11 petition was filed. Since the lease was in default, the right of the Debtor to assume must be predicated on both Section 365(a) of the Bankruptcy Code, which gives the Debtor the right to assume the lease, subject to this Court's approval, and on Section 365(b)(1) which imposes conditions to assumption in circumstances where a default has occurred.

■ Code Section 365(a), as noted, permits the Debtor to assume the lease, subject to the approval of this Court. No limitations or conditions on assumption are imposed by that section of the Code. Cases arising under that section have held that the question before the Court is whether the assumption represents a sound business judgment on the part of the Debtor and will not be prejudicial to the interest of the creditors. *In re Natco Industries, Inc.*, 54 B.R. 436 (Bkrtcy.S.D.N.Y.1985); *In re Currivan's Chapel of the Sunset*, 51 B.R. 217 (N.D.Calif.1985). In the present case, if the Debtor does not assume this contract, there is no business left to reorganize. Further, there is a need to assume the lease at the present time in order for the Debtor to arrange its financing and to formulate a plan. If the lease is assumed and the Debtor subsequently defaults, such default will not be injurious to the interest of the creditors, even if a significant administrative claim results, because there will be no assets with which to pay the creditors in any event. Thus, the Court concludes that assumption of the lease represents sound business judgment, would not be detrimental to the interest of the creditors, and assumption should be allowed. The Court must, therefore, consider whether the conditions imposed under Section 365(b)(1) have or can be met.

Section 365(b)(1) places conditions on the assumption for the purpose of protecting the interests of the Lessor. It provides that the Debtor may not assume the lease unless, at the time of the assumption, the Debtor

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

The Court must examine each requirement and be assured of compliance therewith before the Debtor can be permitted to assume the lease.

■ The Debtor argued at the time of trial that the issues concerning default and the requirement of cure imposed by § 365(b)(1)(A) should be limited to the default as to which formal notice was given before the filing of the Chapter 11 case; i.e., the failure to pay the second quarter advance royalty payment. The Court does not agree. The Code does not speak in terms of defaults as to which notice has been given. Section 365(b)(1)(A) states that if there has been a default, the debtor must cure or provide adequate assurance that the debtor will cure the default. It is this Court's opinion that the language of the statute fairly includes all defaults under the lease regardless of whether notice of such default was given prior to the filing of the Chapter 11.

The Lessor, in its filed objection to the Debtor's requested assumption, has asserted that the Debtor is in default under the lease for a variety of reasons. The Court must consider and rule on each of the grounds of asserted default and apply the test of § 365(b)(1) as to each default before allowing assumption.

The first asserted default was the failure to pay the second quarter minimum royalty payment. The Debtor gave formal notice of that default electing to terminate the lease if the payment was not made within thirty (30) days as provided for in the lease. It was within that 30–day period that the Debtor filed the within Chapter 11 proceeding. At the hearing on the Debtor's application to assume, the Debtor tendered to the Lessor the full amount of the defaulted lease payment in the form of a certified check. The Lessor declined to accept the tender; however, the Debtor has established its ability to cure the defaulted payment and has the availability of funds to do so promptly after assumption of the lease.

The Lessor claims that the Debtor is in default for its failure to expend $200,000.00 in development expenses at the mine and mill site during the last year. However, the president of the Debtor testified that the Debtor has expended in excess of $2,000,000.00 in pursuit of the mining project, which would be an amount sufficient to fulfill the Debtor's obligations in this regard for the full base term of the lease. No evidence was elicited or brought forward to refute the Debtor's assertions, and the Court concludes that there has been no default under the lease for failure to do the minimum annual development work.

The Lessor asserted that a default existed because of the failure of the Debtor to pay the real estate taxes. Again, the President of the Debtor testified that since the filing of the Chapter 11, the taxes have been paid. Thus, the default, if any, has been cured.

■ The Lessor complains that it was not given notice in the past of the time and place for the gathering of "free" gold, and that the Lessor was not provided with the maps of drilling activities and the other reports called for under the lease. The Court notes that no complaint has been made in the past by the Lessor concerning these matters. Testimony established that the Lessor has had free access to the mine and to the mining records at any time, that the Debtor's foreman at the mine site has

been extremely helpful and congenial in escorting the Lessor, and the Lessor's experts, around the mining property, and has been very cooperative and open in providing information. The Court concludes that, to the extent there may have been past failures to timely perform these various covenants, the failure of the Lessor to insist on such timely performance in the past constitutes a waiver of any defaults that may have occurred. As to ongoing obligations, the Debtor has expressed a willingness and an ability to provide the maps and other information to the Lessor on a timely basis and a willingness to comply strictly with the notice requirements under the lease. The Court concludes that, as to these asserted grounds for default, the Debtor was not in default and there has been adequate assurance that any defaults that may have occurred and were waived will not reoccur.

The Lessor claimed that the Debtor has not paid the royalties properly due under the lease, but there was no proof concerning this at the trial other than some conclusory statements by an officer of the Lessor. To the contrary, the Debtor testified that all payments have been made and that all accountings necessary under the lease have been provided to the Lessor. The Debtor further testified concerning the Lessor's misunderstandings about the disposition of the gold and the accounting thereunder. Again, the Court concludes that there is no evidence sufficient to establish that the Debtor has defaulted in its obligation to pay the royalties specified under the lease. Of course, the Lessor is not estopped from making further inquiry and from asserting in the future a default for failure to pay the proper royalties if evidence of the same exists. All that is concluded for the purpose of this ruling is that no default has been shown as to the payment of royalties which would have to be cured by the Debtor before an assumption can be approved under § 365 of the Code.

The Debtor, in the pursuit of its operations on the leased premises, cut some trees. The timber, to the extent that it was utilizable, was sold to a local lumber company. The remaining timber remains at the mine site. The Lessor has asserted that the Debtor had no right to cut the timber, has failed to properly account for the timber, and that this act constitutes waste under the lease, giving rise to an event of default. The Debtor testified that the cutting of the timber was necessary in order to clear space for pads to be used in the leaching operations, as well as to clear sites for the waste materials. The Debtor further presented testimony that the Lessor was paid the stumpage price for the timber.

■ Under the lease the Debtor is not granted the right to cut or utilize the timber. Nevertheless, since the lease does specifically grant the Debtor the right to carry on mining operations, and since payment to the Lessor is premised on royalties to be derived from gold yield at the lease, it is clear under the law that the Debtor has the right to cut timber to the extent that it is reasonably necessary to carry on the operations. See *Weathers v. M. C. Lininger and Sons, Inc.*, 68 Or.App. 30, 682 P.2d 770 (1984); *Yaquina Bay Timber and Logging Co. v. Shiny Rock Mining Corporation*, 276 Or. 779, 556 P.2d 672 (1976); *Jasper Land Co. v. Manchester Sawmills*, 209 Ala. 446, 96 So. 417 (1923). There is no evidence that this Debtor cut or removed any more timber than was necessary for the operations. There also is no evidence that the work was done in an unworkmanlike or unminerlike fashion. Neither is there evidence to indicate that this Debtor has failed to properly turn over and account for the proceeds derived from the sale of the timber. Thus, again the Court concludes that the Lessor has failed to establish the existence of a default by reason of the removal of the timber.

The Lessor complains that it was not given proper notice of the assignment of the lease to the Debtor. The Court notes by the terms of the lease that such is not an event of default. There are no limitations on the right of the Lessee to assign the lease and no requirement of prior no-

tice of such assignment. All that the lease speaks to is that the assignment shall not be effective until the notice is given. Further, the Debtor testified that notice was given in the past and full notice was given at the time of the hearing.

■ The Lessor asserts that the Debtor has failed to operate in accordance with the laws of the State of Montana. In particular, it is asserted that the Debtor has wrongfully polluted water in violation of the state water pollution laws. As evidence of the Debtor's failings in this regard, the Lessor introduced in evidence a copy of a complaint filed in the District Court in the State of Montana styled "State of Montana, ex rel, Department of Health and Environmental Sciences, Plaintiff, v. Triad Investments, Inc., Defendant." Triad Investments, Inc. is a predecessor in interest to the Debtor in this proceeding. The complaint filed alleges violations of the Montana Water Quality Act. No other evidence of the existence of an actual violation of the law was presented.

In the view of this Court the filing of a complaint does not constitute evidence of violation of the law. The Debtor's president testified that the Debtor is defending against the claim and has made financial arrangements to take any remedial action which might ultimately be negotiated with the State of Montana to ameliorate the claimed violation. The Court concludes that there has been no evidence to show a violation of the lease in this regard and, therefore, no proof of default for failure to comply with those provisions of the lease.

It is undisputed that there have been a variety of mechanics liens filed against the property arising out of the Debtor's operations at the mine. The Debtor has testified as to each of the asserted lien claims, to lawsuits which have been started to foreclose such liens, and that the Debtor has defenses which it is asserting as to those liens. So long as a good faith defense is being put forward, there is no default under the lease. Further, the Court observes that prosecution of those lien cases is stayed by the filing of the Chapter 11, and

the Debtor may well be able to deal effectively with the mechanics liens through its plan of reorganization.

The Lessor argues that the existence of the liens is also evidence that this Debtor has failed to operate the property in conformity with the laws of the State of Montana. The Court does not agree. The lease provisions dealing with compliance with the laws of the State of Montana are clearly not intended to encompass such things as disputes with unpaid suppliers giving rise to mechanics liens, but are directed toward regulatory matters.

The Lessor also complains that it is a party defendant to certain of the mechanics lien cases and is being damaged by having to appear and defend in those actions. It asserts that the Debtor is not fulfilling its obligations to protect and defend the Lessor's interest in those cases. The Court notes, however, that under the terms of the lease, there is no undertaking on behalf of the Lessee to defend the Lessor as to mechanics lien claims. The only express indemnity provisions relate to violations of state law or to pollution claims. The Lessor is not a party defendant to the case brought by the State of Montana on the pollution claim. Inasmuch as this Debtor has no obligation to defend the interests of the Lessor as a party to the mechanics lien cases, no default exists under the lease in this regard.

Having examined each individual default which has been specified and argued by the Lessor, the Court has concluded that most of such alleged defaults are not, in fact, defaults under the lease, and such defaults that have occurred have either been cured or the Debtor has demonstrated adequate assurance that it will promptly be able to cure following permitted assumption of the lease.

As to the provisions of Section 365(b)(1)(B) of the Code which require the Debtor to compensate the Lessor for any actual pecuniary loss resulting from defaults, there has been no allegation in the Lessor's objections of any such pecuniary loss. There is no prayer in the Lessor's

objections for compensation for any such pecuniary loss. Finally, there was no evidence offered at the trial on this issue as to any such pecuniary loss beyond the cost of defense in the mechanics lien cases. The filing of the lien claims and commencement of the suits to foreclose those claims does not constitute grounds for default so long as the Debtor is dilligently and in good faith defending against those claims which, in this case, the Debtor is. Further, pending this Chapter 11, the Lessor will be put to no expense because the lien suits are stayed. Finally, as noted above, there are no indemnity provisions as to the cost of defense as to any of the lien suits. Thus, there has been no showing of any damages or pecuniary loss for which the Debtor must provide compensation under Section 365 (b)(1)(B).

The Court now comes to the question of the application of and standards to be applied under Section 365(b)(1)(C) which requires that the Debtor must provide "adequate assurance of future performance" under the lease. There was no such provision under the predecessor Bankruptcy Act. It is therefore appropriate to examine the legislative history underlying the provision.

The Report on the Commission on the Bankruptcy Laws of the United States noted the need to change the law as concerns the enforceability of lease termination clauses in arrangement and reorganization cases; i.e., the typical *"ipso facto"* provision. The Commission stated:

> The Commission recommends that both executory contracts, about which the present act is silent on this point, and unexpired leases be enforceable in business reorganization cases, notwithstanding such a "bankruptcy clause" or anti-assignment clause, if the debtor or his trustee cures past defaults and, for contracts but not leases, gives adequate assurance of future performance.

In explaining why such *ipso facto* clauses should not be applicable in reorganizations, but would remain applicable in liquidation cases, the Commission's Report states:

The difference in policy is justified on the ground that in reorganization cases the purpose of assumption is the continuation of the business. In liquidation cases the purpose is typically for the assignment of the agreement to a purchaser from the trustee. In the former situation the reorganization of the debtor should be paramount, provided that the nondebtor party is protected. In the case of a supply or manufacturing contract, in which the nondebtor party may be called upon to incur substantial costs in anticipation of future performance, the protection should include adequate assurance of the debtor's future performance. Report of the Commission on the Bankruptcy Laws of the United States, H.R. Document # 93–137, 93rd Congress, First Session, Part One, p. 198 (Collier, Bankruptcy, 15th Ed., App. 2)

Part Two of the Commission's Report was the proposed draft of a new bankruptcy law. That proposed law contained provisions concerning the assumption or the rejection of executory contracts, and as to those provisions the Commission further reported as follows:

> In order to assume a contract or lease, past defaults must be cured and, for contracts but not leases, "adequate assurance of future performance" must be given. The language quoted is adapted from Uniform Commercial Code § 2–609(1). What constitutes "reasonable time thereafter" for curing defaults or an "adequate assurance of future performance" must be determined by consideration of the facts of the proposed assumption. *Cf.* Official Comment 4 to Uniform Commercial Code § 2–609 (1972 ed.). It is not intended, however, that any nondebtor party should acquire greater rights in a case under the Act that he has outside the Act. Report of the Commission on the Bankruptcy Laws of the United States, *supra*, Part 2, pps. 156–157.

Section 2—609 of the U.C.C. recognizes that a contract for the sale of goods imposes an obligation on each party that the

other's expectation of receiving a performance under the contract will not be impaired. That section provides:

> When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return. U.C.C. § 2–609(1).

The section then provides, in subsection (2), that the "adequacy of any assurance offered" is to be determined according to commercial standards.

The problem that the drafters of the Uniform Commercial Code sought to solve by this provision is adequately described in the Draftsmen's Comment to the section. It is there stated:

> A seller needs protection not merely against having to deliver on credit to a shakey buyer, but also against having to procure and manufacture the goods, perhaps turning down other customers. Once he has been given reason to believe that the buyer's performance has become uncertain, it is an undue hardship to force him to continue his own performance. Similarly, a buyer who believes that the seller's deliveries have become uncertain cannot safely wait for the due date of performance when he has been buying to assure himself of materials for his current manufacturing or to replenish his stock of merchandise.

The Draftsmen go on to discuss the concept of "adequate assurance" as follows:

> What constitutes "adequate" assurance of due performance is subject to the same test of factual conditions. For example, where the buyer can make use of a defective delivery, a mere promise by a seller of good repute that he is giving the matter his attention and that the defect will not be repeated, is normally sufficient. Under the same circumstances, however, a similar statement by a known corner-cutter might well be considered insufficient without the posting of a

guarantee or, if so demanded by the buyer, a speedy replacement of the delivery involved. By the same token where a delivery has defects, even though easily curable, which interfere with easy use by the buyer, no verbal assurance can be deemed adequate which is not accompanied by replacement, repair, money-allowance, or other commercially reasonable cure. Draftsmen's Comment to Uniform Commercial Code § 2–609.

In attempting to divine the legislative intent, it is instructive to compare the different statutory approaches under Section 365 of the Code. If there are no defaults under the contract sought to be assumed, there is no statutory mandate for the debtor to have to provide "adequate assurance of future performance" before assumption. If, however, we are dealing with a defaulted lease of real property in a shopping center, Congress was explicit in specifying that the debtor must provide adequate assurance of the source of rent and other consideration due under the lease. 11 U.S.C. § 365(b)(3)(A). Such an explicit test is not included as a part of § 365(b)(1)(C).

 From its inquiry into the legislative history, the examination of the Draftsmen's Comments to the U.C.C., and the diverse sections of the Bankruptcy Code, it is apparent to this Court that each case must rest on a pragmatic analysis taking into account the lessor's rights and expectations as they existed prior to the filing of the bankruptcy proceeding and adequately protecting such rights. At the same time, as the legislative history makes clear, the position of the Lessor is not to be improved to the detriment of the debtor. *In re Natco Industries, Inc.*, 54 B.R. 436, 441 (Bkrtcy.S.D.N.Y.1985).

 In the present case the lease contains no *ipso facto* clause. Had this Debtor had the money available pre-petition to cure its default in the nonpayment of the second quarter minimum royalty, it would have been able to cure such default simply by paying that one defaulted payment, and the Debtor's financial condition or its abili-

ty to perform in the future would never have arisen.

Since there is no *ipso facto* termination clause in the lease, the filing of the present Chapter 11 has essentially not interfered with the rights and remedies of the Lessor, except as they pertain to the prompt payment of the royalty which was due. In certain types of cases this could impose a hardship which would require the Debtor, in providing adequate assurance of future performance, to prove that it would be unlikely to occur in the future. For example, in shopping center leases or other commercial properties, the owner of the property typically has borrowed large sums of money to finance the construction and depends on the income stream from the leases to pay the underlying mortgage. Under these circumstances, the owner/lessor may well be justified in demanding assurance of that future income stream before the lease could be assumed. This is similar to the problem posed by U.C.C. § 2–609. In the present case, however, the Debtor, as the Lessee under the mining lease, has the right to terminate the lease at any time upon 30 days notice, thereby terminating any future performance under the lease. In light of this termination right the Lessor could have had no realistic expectation of an assurred future income stream from the lease. Thus, the Court can see no reason why this Debtor should be required to establish proof of its ability to reorganize and remain in business and generate a future income stream of cash sufficient to pay future rental, an obligation which this Debtor is free to terminate at any time in any event.

The Lessor argues that the Debtor is under an obligation to remove the liens which have been filed against the property and, as part of the "adequate assurance", to prove its ability to do so, either by way of litigation or by way of funding to pay off the liens. The Court has previously noted that as to the imposition of the liens, there is no default under the lease so long as the Debtor is proceeding in good faith to contest those liens. Once again, pre-petition, the Debtor's shakey financial condition and its possible inability to discharge liens which might ultimately be adjudicated against the property would not have been grounds to permit this lessor to terminate the lease. Under the lease the Lessor had not bargained for continuous proof of financial stability on the part of the lessee. In fact, the evidence indicates that the original lessee's business was a wholly speculative venture. Thus, the Lessor was always at risk that workmen or suppliers might not be paid, giving rise to unsatisfied liens on the property. Since no default has occurred in this regard, and since the Lessor should not be permitted to improve its position or reduce the commercial risks it has otherwise subjected itself to simply because the Debtor has now sought the protection afforded it by the Bankruptcy Code, this Court sees no reason why, as a condition to assuming the lease, the Debtor should be required to provide greater protection in this regard.

In inquiring into the issue of adequate assurance of future performance and, as a part of the Court's pragmatic analysis, it is also meaningful to consider the alternatives available to the Court and the relative impact on the Lessor of those alternatives. In the first instance, the Court could order that the lease shall be deemed to be rejected. That order would be the death knell for the reorganization case. As to the Lessor, present operations of the mining and leaching of gold would terminate. Thus, there would be no royalties paid by this Debtor and, considering the lateness of the season in Montana, it is unlikely that the Lessor would be able to generate operations to realize any additional royalties for this year. The Lessor would have a claim in the estate for the rejection which is limited by Section 502(b)(6) of the Code. Since there are no other assets in the estate of any significance, and apparently none which are not encumbered, the Lessor would not even receive the unpaid pre-petition royalty payment which the Debtor has now offered to pay. As to the lien suits on the property, the Debtor would no longer have an interest in the property, and there-

fore would no longer provide any defense of those suits. Further, it appears to the Court that the lien suits would no longer be stayed, and the lien claimants would be free to proceed without being subjected to the negotiating process imposed by the Chapter 11 which might otherwise bring a satisfactory resolution to those lien claims, all to the benefit of the Lessor. In short, if the Court were to mandate rejection of the lease, the Lessor would get the property back, subject to all of the lien claims and all of the problems and with no operations and no payments.

Secondly, the Court could deny the Debtor the right to assume the contract and extend the period for assumption or rejection, on the theory that the question of adequate assurance of future performance could best be determined at the time of confirmation of a plan. To do so, however, will imperil the Debtor's financing efforts and probably make it impossible to promulgate a plan leading, in all likelihood, to the ultimate rejection of the lease. In the interim, the Debtor could continue to operate and would be obligated to pay the Lessor royalties accruing on the gold produced post-petition, as well as to otherwise perform under the lease pending assumption or rejection. 11 U.S.C. § 365(d)(3). Under this scenario the Lessor would gain some slight benefit, but likely would shortly end up in the same situation as if rejection of the lease were ordered at the present time.

The third alternative is to permit the Debtor to assume the lease now. This will require the Debtor to cure the past defaults, as dealt with above, to the benefit of the Lessor. Operations will be ongoing and royalties will accrue to the Lessor in the interim. In addition the lien suits remain stayed, and the Debtor has the opportunity to negotiate with the lien claimants, as well as the State of Montana, within the context of the Chapter 11 proceeding, which certainly benefits the Lessor. Permitting the Debtor to assume at the present time also heightens the ability of the Debtor to move forward toward effecting a plan of reorganization.

The Court recognizes that there is a significant risk that the Debtor will be unable to effect a plan of reorganization and that ultimately, if the lease is assumed, the Debtor may default in its performance under the lease. If that occurs, the Lessor will then have an administrative claim in this estate for the damages suffered by reason of the default. If there were other assets in the estate, the risk of the administrative claim might cast doubt on the advisability of permitting the assumption at the present time because of the ultimate adverse effect on the other creditors of the estate. In the absence of other significant assets, such a risk is of little or no consequence. As to the Lessor, assumption followed by a subsequent default would appear to put the Lessor in the best possible position. The Lessor will receive the defaulted royalty payment. The Lessor will receive royalties by reason of current operations. The Lessor will receive the benefit of the ongoing defense of the mechanics lien suits and the efforts to settle those claims, and the Lessor will enjoy the benefits from whatever ongoing exploration is conducted by the Debtor. All of those benefits will be retained even if there is an ultimate default leaving the Lessor in the position of retaking the property several months from now. By the same token, no evidence has been offered to indicate that the Debtor's ongoing operations will be detrimental to the property. The budgets presented indicate that the Debtor will have the ability to pay the costs of its ongoing operations so that the property will not be burdened by additional lien claims. Beyond that, even the testimony of the Lessor's expert appeared to support the conclusion that the operations were being carried on in a good minerlike fashion, albeit, in his opinion, perhaps at an economic loss.

If the Court were to deny the Debtor its request to assume the lease, the Lessor would, in effect, receive a benefit it had never bargained for. As the legislative history and the authorities indicate, Section 365 should not be used to improve the Lessor's position. Neither should it be

used to the Lessor's detriment. By the Court's analysis, the purpose of Section 365 of the Code is best fulfilled by permitting the Debtor to cure its past defaults and assume the lease.

IT IS THEREFORE ORDERED that the Debtor shall have twenty-one (21) days from the date of this Order within which to pay the Lessor the unpaid pre-petition royalty payment which was due, and

IT IS FURTHER ORDERED that the Debtor's application to assume the lease is hereby granted.