**NCL CORP., a Nevada Corporation, Plaintiff, Counter–Defendant,**

v.

**LONE STAR BUILDING CENTERS (EASTERN) INC., a Delaware corporation, Lone Star Building Centers, Inc. a Minnesota corporation, and Lone Star Industries, Inc., a Delaware corporation, Defendants, Counter–Plaintiffs.**

**No. 89–6822–CIV.**

United States District Court, S.D. Florida.

July 30, 1992.

Lawrence P. Bemis, Merry E. Lindberg, Steel Hector & Davis, Miami, Fla., for plaintiff, counter-defendant.

Franklin G. Burt, David P.C. Ashton, Jorden Schulte & Burchette, and James S. Lupino, Storace & Lupino, Miami, Fla., for defendant, counter-plaintiff, Lone Star Building Ctrs. (Eastern) Inc.

Alan G. Greer, Robert Borrello, Floyd Pearson Richman Greer Weil Brumbaugh & Russomanno, Miami, Fla., for Franklin G. Burt and Jorden Schulte & Burchette.

## AMENDED ORDER ON STATUS CONFERENCE AND ORDER FOR PRETRIAL CONFERENCE AND JURY TRIAL

NESBITT, District Judge.

This cause came before the Court on May 15, 1992 for Status Conference. Argument was heard on the following motions: Plaintiff's Motion to Disqualify Defendant's Counsel; Plaintiff's Motion to Dismiss Counterclaim of Defendant Lone Star; and Plaintiff's Motion for Protective Order. Also discussed at the Status Conference was extension of the field sampling cutoff date, a briefing schedule for all filed but not fully briefed motions, and pretrial conference and trial dates.

### I. BACKGROUND

This case arises out of the release of hazardous substances on a piece of property located in Dania, Florida (the "Site"). The Plaintiff, NCL Corporation ("NCL"), was the lessee of the Site from 1989 to 1991 and in its eleven count complaint is suing the owner and lessor, Lone Star Building Centers, Inc. ("Lone Star"), for the costs it has already incurred, and will continue to incur in cleaning up the Site. In response to NCL's complaint, Lone Star has filed an answer and a seven count counterclaim arguing that NCL and previ-

ous lessees of the Site are responsible for the pollution. Lone Star, like NCL, is seeking its clean-up costs and in addition, is seeking a declaration that NCL's lease and option to buy the property have been terminated by its actions.

In 1962, Lone Star purchased the Site. Between 1962 and 1979, as part of its wholesale and retail lumber and building material supply company in Florida, Lone Star used the Site as a distribution, warehouse, and operations center. From 1962, when Lone Star bought the property, until 1977, Lone Star used the property to "dip treat" wood. NCL Corp. argues that during the wood dip treating operation, large stacks of lumber would be lowered into concrete vats filled with chemicals to treat the wood. The lumber would then be raised above the vat and permitted to drip for a period of time and then would be lowered onto the ground where more dripping would occur. By putting the treated wood on the ground, NCL claims that over the course of 20 years the release was substantial and was the cause of the pollution on the Site.

Lone Star, on the other hand, claims that NCL and its predecessors, which have leased the property since 1979, were responsible for the pollution. Lone Star points the finger primarily at Lindsley Stores, Inc. ("Lindsley"), also a retail lumber and building supply business, arguing that when Lindsley took over the property as lessee in 1979, it drained the chemicals from the dip tanks onto the ground, knocked down the tanks, and then buried and paved over the remains of the tanks which were full of contaminated sludge. Lone Star also contends that Lindsley exacerbated matters by running a water main through the buried remains of the dip tanks in 1983 thereby spreading the pollution. Finally, Lone Star argues that Lindsley and Nightingale Liquidating Corporation (the name Lindsley took when it changed its name in 1987) operated a gas tank (Tank 2) on the Site between 1979 and 1988 and that the gas tank leaked, further adding to the pollution.

In 1985, during its term as lessee of the Site, Lindsley filed for Chapter 11 bankruptcy. Lindsley retained control of the lease following bankruptcy discharge in 1986. In 1987, Lindsley sold the majority of its assets and the Lindsley name (the lease was not included in the deal) to Westlake Hardware Company ("Westlake"). In 1987, immediately following the sale to Westlake, Lindsley changed its name to Nightingale Liquidating Corporation ("Nightingale"). The lease remained in Nightingale's possession until August 1989 when Nightingale assigned the lease to Evans Asset Holding Company ("EAHC") which, on the same day, assigned the lease to NCL, the current plaintiff in this action. Four months later, in December 1989, Nightingale dissolved. *See* Appendix.

## II. ANALYSIS

### A. *Plaintiff's Motion to Dismiss Defendant's Counsel*

■ Frank Burt, Lone Star's counsel, represented Lindsley from 1980 to 1986. As part of his representation of Lindsley, Mr. Burt was involved in the drafting of the lease agreement between Lone Star and Lindsley, which is the basis of Lone Star's Counterclaim in which it seeks a declaration that the lease has been terminated as a result of Lindsley's conduct. Also as part of his representation of Lindsley, Mr. Burt oversaw all the legal work required for the installation of the water main which runs across the property and through the buried remains of the dip tanks. Lone Star is now arguing in its counterclaim that the installation of this water system was negligent because it goes through the remains of the dip tanks and is responsible for the spread of the pollution from the dip tank area to other parts of the property. As a result of Mr. Burt's past representation of Lindsley, NCL argues that Mr. Burt has violated the mandate of Rule 4–1.9(a) of the Rules Regulating the Florida Bar and must be disqualified.

Rule 4–1.9(a) states:

A lawyer who has formerly represented a client in a matter shall not represent

another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

Disqualification is the appropriate remedy where a violation of Rule 4–1.9(a) has been established. In order to establish an ethical violation of 4–1.9(a), the moving party must prove:

1) the moving party and the targeted opposing counsel actually had a prior attorney client relationship

2) the interests of the opposing counsel's present client are adverse to the movant; and

3) the matters involved in the present underlying lawsuit are substantially related to the matters for which the opposing counsel previously represented the moving party.

*Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir.1978).

The second and third elements of the above test have been satisfied. The interests of Lone Star and Lindsley are clearly adverse. Furthermore, because Mr. Burt was involved with the drafting of the lease between Lindsley and Lone Star and because he oversaw all legal affairs involved in putting in the water main (essential elements to Lone Star's counterclaims), the current lawsuit is substantially related to Mr. Burt's former representation of Lindsley. The crux of this issue, then, lies in determining whether or not the right to assert the attorney client privilege passed from Lindsley to NCL.

■ The Fifth Circuit, in *In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 89–90 (5th Cir.1976),[1] held that the right to assert the attorney client privilege does not change hands with the assignment of assets. *See also In re Grand Jury Subpoenas 89–3 and 89–4*, 734 F.Supp. 1207, 1211 (E.D.Va.) (a transfer of assets alone is insufficient to transfer a corporation's right to assert the attorney-client

[1] The Eleventh Circuit has adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v.*

privilege), *aff'd in part, vacated in part*, 902 F.2d 244 (4th Cir.1990). The right to assert the attorney client privilege is an incident of control of the corporation and remains with the corporation as it undergoes mergers, takeovers, and name changes. *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 349, 105 S.Ct. 1986, 1991, 85 L.Ed.2d 372 (1985).

In 1989 Nightingale, formerly known as Lindsley, transferred the lease to EAHC, which in turn transferred it to NCL. Four months after the transfer of the lease from Nightingale to EAHC, Nightingale was dissolved. In accordance with *In re Yarn Processing Patent Validity Litig.*, the transfer of the lease to EAHC and then to NCL Corp. did not transfer the attorney client privilege. Such transfers of assets do not transfer the right to assert the attorney client privilege unless the attorney consents. The privilege remained with Nightingale and was lost when Nightingale was dissolved. Therefore, NCL cannot establish the first requirement necessary to prove a violation of Rule 4–1.9(a). Accordingly, it is

ORDERED AND ADJUDGED that Plaintiff's Motion to Dismiss Defendant's Counsel is DENIED.

## B. *Plaintiff's Motion to Dismiss Defendant's Counterclaim*

Lone Star's answer contained seven counterclaims seeking injunctive, compensatory and contributory relief for Lindsley and NCL's pre- and post-bankruptcy activities. NCL moved to dismiss the counterclaims arguing that they stem from prepetition conduct and, therefore, were discharged in Lindsley's bankruptcy. Lone Star counters that NCL is responsible as an "owner" and "operator" of the Site under CERCLA, *see* 42 U.S.C. § 9607(a), and also because the bankruptcy trustee assumed Lindsley's leases to the Site and assigned them to NCL.

*City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

In *In re Chateaugay Corp.*, 944 F.2d 997 (2nd Cir.1991), the Second Circuit considered whether post-petition CERCLA response costs incurred correcting pre-petition contamination are dischargeable in bankruptcy. The Environmental Protection Agency (the "EPA") in *Chateaugay* filed bankruptcy claims for response costs it had incurred at 14 sites at which the debtor was a "potentially responsible party" ("PRP"). *See* 42 U.S.C. § 9607(a) (1988). All but one of the sites, however, required additional response costs and the EPA contended that the debtor might also be a PRP at various unidentified sites. The EPA filed an adversary proceeding to determine whether future response costs for the identified and unidentified sites were "claims" under section 101(4) of the Bankruptcy Code (the "Code"). 11 U.S.C. § 101 *et seq.* The debtor maintained that because the costs stemmed from pre-petition conduct they were claims and, therefore, dischargeable. The EPA reasoned that until it incurred the response costs it had no "claim" and, therefore, the costs were not dischargeable. The district court agreed with the debtor, holding that post-petition response costs for pre-petition releases or threatened releases were dischargeable even if the EPA became aware of the releases after the bankruptcy.

In affirming the district court, the Second Circuit initially reviewed Code section 101(4)'s definition of "claim." The court reasoned that

> Congress unquestionably expected this definition to have wide scope. "By this broadest possible definition ... the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case."

*Id.* at 1003 (citing H.R.Rep. No. 595, 95th Cong., 2d Sess. 309 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6266).

Although the court recognized that this language might arguably bar victims of a bridge collapse from asserting claims if the bridge was constructed before, but collapsed after, the construction company filed for bankruptcy, the court opined

> Yet it must be obvious that enormous practical and perhaps constitutional problems would arise from recognition of such a claim. The potential victims are not only unidentified, but there is no way to identify them. Sheer fortuity will determine who will be on that one bridge when it crashes. *What notice is to be given to these potential "claimants"?*
>
> \* \* \* \* \* \*
>
> *To expect "claims" to be filed by those who have not yet had any contact whatever with the tort-feasor has been characterized as "absurd."*

*Id.* at 1003 (citations omitted) (emphasis added).

The court noted, however, that courts have found that tort victims with undiscovered injuries nevertheless had dischargeable claims if the victim had even minimal conduct with the debtor—such as buying the debtor's product. *Id.* at 1004. Regardless, the Second Circuit found that CERCLA claims did not involve the same difficulties posed by undiscovered tort claims explaining:

> We need not decide how the definition of "claim" applies to tort victims injured by pre-petition conduct, especially as applied to the difficult case of pre-petition conduct that has not yet resulted ... in any tortuous consequences to a victim. We deal here with the far more manageable problem of sums ultimately to be owed to EPA at such time as it incurs CERCLA response costs.

*In re Chateaugay*, 944 F.2d 997, 1004 (2nd Cir.1991).

The Second Circuit viewed the affiliation between the EPA and the debtor as analogous to a contract rather than a tort relationship. *Id.* According to the Second Circuit, "unmatured" and "contingent" contract claims are defined as "obligations that will become due and payable upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" *Id.* (citing *In re All Media Properties, Inc.*,

5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd mem.*, 646 F.2d 193 (5th Cir.1981)). Although the court stated that the concept of a maturing contract claim differed from tort and statutory claims, it nevertheless found that the relationship between the EPA and debtor warranted applying the contract standard. Specifically, the court held

> Though there does not yet exist between the EPA and [debtor] the degree of relationship between claimant and debtor typical of an existing though unmatured contract claim, the relationship is far closer than that existing between future tort claimants totally unaware of injury and a tort-feasor. EPA is acutely aware of [the debtor] and vice versa. The relationship between environmental regulating agencies and those subject to regulation provides sufficient "contemplation" of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of "claims." True, EPA does not yet know the full extent of the hazardous waste removal costs ... and it does not yet even know the location of all the sites at which such wastes may yet be found. But the location of these sites, the determination of their coverage by CERCLA, and the incurring of response costs by EPA are all steps that may fairly be viewed, in the regulatory context, as rendering EPA's claim "contingent," rather than as placing it outside the Code's definition of "claim."

*Id.* at 1005.

Applying its rationale, the Second Circuit affirmed the district court's holding that response costs are dischargeable where they result from *pre-petition releases or threatened release of hazardous substances.*

Subsequent to the Second Circuit's *Chateaugay* decision, the District Court for the Northern District of Texas addressed the same issue in *In re National Gypsum Company*, 139 B.R. 397 (N.D.Tex.1992). In *National Gypsum*, the debtor notified the EPA when it filed for bankruptcy that it might be a PRP at various CERCLA

sites. The bankruptcy court then granted the EPA an extension of time to file its claims so that it could adequately investigate the debtor's possible CERCLA exposure. Although the EPA eventually identified over 21 potential sites, it chose to assert claims for only seven of those sites (the "Listed Sites"). The EPA explained that its decision was an exercise of prosecutorial discretion based on its belief that it lacked sufficient information to assert CERCLA claims for the remaining sites. The court was faced with two issues relevant to this Court's determination: (1) whether future costs at the Listed Sites were dischargeable claims; and (2) whether response costs for pre-petition releases at the Unlisted Sites were dischargeable.

Relying on *Chateaugay,* the court found that the debtor's liabilities for the Listed and Unlisted sites were dischargeable. The Court departed from *Chateaugay,* however, by holding

> [t]he Chateaugay ruling covers releases that have occurred prepetition, even though they have not been discovered by EPA or anyone else. The powers and knowledge of a regulatory agency are presumed to "fairly" allow for "sufficient contemplation of [such] contingencies...." While similarly of the view that conduct giving rise to release or threatened release of hazardous substances pre-petition should be the relevant inquiry in determining the existence of the claim in bankruptcy, this Court is not willing to favor the Code's objective ... over CERCLA's objective ... to the extent exhibited in Chateaugay.... there exists no meaningful distinction between debtor's conduct and the release or threat of release resulting from this conduct. The only meaningful distinction that can be made ... is one that distinguishes between costs associated with pre-petition conduct resulting in a release or threatened release that could have been "fairly" contemplated by the parties; and those that could not have been "fairly" contemplated by the parties.

*Id.* (footnotes omitted)

Thus, the *National Gypsum* court declined to presume "sufficient contemplation" of

the response costs at the Listed Sites based on EPA's regulatory relationship with the debtor. Regardless, the court found that the facts demonstrated that these costs were fairly contemplated and dischargeable. *Id.* at 412. The court also applied the "fairly contemplated" test to EPA's response costs for the Unlisted Sites. Because the conduct, release, and initial response costs occurred pre-petition, the court found that the EPA had "enough knowledge to fairly base contingent liability on, but chose not to do so." *Id.* at 412. Because the EPA failed to assert its claims, it was barred pursuant to Bankruptcy Rule 3003(c)(2).

Lone Star offers basically two arguments in opposition to NCL's motion to dismiss. First, Lone Star argues that NCL is liable because it was a post-petition "owner" and "operator" under section 9607(a)(1) of CERCLA. Second, Lone Star argues that by assuming the leases and then assigning them to NCL, Lindsley preserved and passed on its pre-petition lease liability.

■ Regarding NCL's CERCLA liability, the Court finds *Chateaugay* and *National Gypsum* dispositive. Under *Chateaugay*, response costs related to pre-petition releases are discharged if "the relationship between the parties provides sufficient 'contemplation' " of the "ultimately maturing payment obligations." *Id.* at 1005. The *Chateaugay* court found that the regulatory relationship between the debtor and the EPA provided "sufficient contemplation" to warrant discharging claims based on pre-petition releases. The relationship between Lone Star and Lindsley is significantly more substantial than the relationship between the EPA and the debtor in *Chateaugay.* Unlike the EPA in *Chateaugay,* which did not even know the location of some of the contaminated sites, Lone Star has owned the Site since 1962; operated a lumber company on the Site from 1962 to 1979; and constructed, maintained and operated the vats containing the contaminating chemicals. Moreover, Lone Star leased the Site, including the dip tanks, to Lindsley in 1979 on the condition that Lindsley take responsibility for the chemicals and indemnify Lone Star for any liability incurred if Lindsley failed to properly maintain the property. Furthermore, the lease also afforded Lindsley the right to inspect the property to insure Lindsley was satisfying its responsibilities. Unlike the somewhat attenuated regulatory relationship in *Chateaugay,* Lone Star and Lindsley had a contractual relationship which contemplated the very facts that give rise to Lone Star's pre-petition claims. It is clear, therefore, that Lone Star's knowledge of, and relationship with, the Site and Lindsley establish that these pre-petition claims were "fairly contemplated" and, therefore, discharged under *Chateaugay.*

■ Even under *National Gypsum's* slightly more rigorous standard, Lone Star's claims are discharged. In *National Gypsum*, the court required that the claims *actually* be "fairly contemplated by the parties." *National Gypsum* at 409. Obviously, Lone Star was aware of the possibility that contamination could occur—indeed, it installed and operated the vats and specifically conditioned Lindsley's lease on Lindsley complying with applicable environmental regulations. Moreover, Lone Star asserted claims in Lindsley's bankruptcy; knew about the dip tanks and Lindsley's contractual obligations; had the right to inspect the property; and chose not to pursue any claims related to the Site. In *National Gypsum*, the court found that claims for discharges the EPA had some knowledge of, but chose not to file, were discharged. Here, Lone Star had actual knowledge of the Site's potential condition, and the ability to inspect the property for contamination. Nevertheless, Lone Star chose not to inspect the property or file a contingent claim. The inevitable finding, therefore, is that Lone Star and Lindsley fairly contemplated these claims; that Lone Star chose not to pursue the claim; and that, therefore, these pre-petition releases constitute pre-petition claims which were discharged in Lindsley's bankruptcy.

■ Lone Star's argument that NCL is nevertheless liable for clean-up costs because it was an "owner" and "operator"

after the bankruptcy is primarily inapposite. Lone Star's argument confuses NCL's responsibilities in a government action to force a clean-up, with its ultimate liability in a private action for contribution. In the former, a party's relationship to a site can require it to clean-up the site, or reimburse the government for cleaning up the site, even if the party was not responsible for the contamination. In the latter, a party who has expended funds cleaning-up a site can sue the parties responsible for the contamination. The present claims involve the latter and thus Lone Star's argument is irrelevant. Of course, under both *Chateaugay* and *National Gypsum*, Lindsley's bankruptcy only discharged liability for pre-petition releases and, therefore, NCL may still be liable for any post-petition discharges, if any, that it was responsible for.

At the heart of Lone Star's second argument are Code section 365(b), as well as, lease provisions which required Lindsley to comply with all legal and regulatory requirements and indemnify Lone Star for its failure to comply with its lease obligations. Lone Star maintains that Lindsley was in default of these lease provisions because its Site management violated state and federal environmental regulations. Section 365(b) of the Code provides that a trustee "may not assume such ... lease unless, at the time of assumption ... the trustee— (A) cures, or provides adequate assurance that the trustee will promptly cure, such default." 11 U.S.C. § 365(b). At the time Lindsley assumed the lease it did not make any payment to Lone Star for violating these lease provisions. Accordingly, Lone Star argues Lindsley assumed all the defaults which it did not otherwise cure when it assumed the lease, and passed liability for those defaults to NCL.

■ Lone Star relies on precedents which hold that when a trustee assumes a lease "it becomes liable for performance of the entire contract, as if bankruptcy had never intervened." *In re Airlift International, Inc.*, 761 F.2d 1503, 1508 (11th Cir. 1985). Lone Star's authorities, however, deal with the debtor's prospective obligations under assumed contracts and not the debtor's liability for pre-assumption defaults. *See id.* (obligations under contract entered into during bankruptcy pursuant to section 1110); *In re Holland Enterprises, Inc.*, 25 B.R. 301 (E.D.N.C.1982) (trustee prohibited from assuming one provision and rejecting future obligations of another provision); *In re Ashley*, 41 B.R. 67 (Bankr.E.D.Mich.1984) (trustee's obligations for "retroactive" assumption); *In re Auto Dealer Servs., Inc.*, 65 B.R. 681 (Bankr.M.D.Fla.1986) (rejected contract). Indeed, one authority Lone Star cites clearly demonstrates that the trustee assumes all prospective rights and obligations under a contract and not liability for pre-assumption defaults. In *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir.1985) the court explained

> [s]ection 365 is intended to provide a means whereby a debtor can force another party to an executory contract *to continue to perform if (1) the debtor ... will continue to perform,* and if (2) the *debtor can cure any defaults in its past performance.*
>
> \* \* \* \* \* \*
>
> Thus, the often-repeated statement that the debtor must accept the contract as a whole means only that the debtor cannot chose to accept *the benefits of the con*tract and reject its burdens to the detriment of the other party.

*Id.* at 1310–11.

Neither the language of section 365(b), nor the cases cited by Lone Star support its position that uncured pre-petition defaults become "assumed" post-petition obligations. Rather, sections 365(b)'s clear import is that the trustee must cure all defaults before assuming the contract's rights or obligations. The statute presumes, therefore, that once a contract is assumed the trustee has satisfied all prior liabilities. Thus, the issue is what recourse does a party have when the trustee assumes a contract without curing a default.

■ Lone Star argues that under section 365 the debtor is responsible for evaluating a lease's benefits and liabilities and curing all defaults and that, therefore, any undis-

covered defaults are the debtor's responsibility. Lone Star's authority, however, does not involve a trustee's failure to cure a default before assuming an executory contract. Lone Star's primary precedent, *In re Grayhall Resources, Inc.*, 63 B.R. 382 (Bkrtcy.D.Colo.1986), is inapposite. *Grayhall* involved a landlord's failure to notify the debtor about a default *before* the debtor filed for bankruptcy. During the bankruptcy, however, the landlord did notify the trustee of the default before the trustee assumed the contract. Likewise, in *In re Boricua Motors Corporation*, 77 B.R. 358 (Bkrtcy.D.P.R.1987), the landlord notified the trustee that the debtor would have to comply with the lease's "Repair and Maintenance" provision if the lease was assumed. Lone Star has failed to cite any authority that pre-petition defaults which the trustee neither cures nor gives adequate assurance of cure become "assumed" post-petition obligations.

 Regardless, Lindsley's bankruptcy precludes Lone Star from asserting any claims based on the leases. First, to the extent Lone Star's claims rely on Lindsley's alleged defaults they are barred by *res judicata*. *Res Judicata* bars the relitigation of claims which were or could have been asserted in another judicial proceeding and issues which were necessarily determined in those proceedings. Wright, Miller and Cooper, *Federal Practice and Procedure* Jurisdiction § 4421 & n. 1 (" '[t]hat a judgement in a suit between parties is conclusive in any other suit between them, or their privies, of every matter that was decided therein, *and that was essential to the decision made*, is a doctrine too familiar to need citation ... in its support.) (quoting *Block v. Commissioners*, 99 U.S. 686, 693, 25 L.Ed. 491 (1878) (emphasis added); *see also Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 593, 94 S.Ct. 806, 819, 39 L.Ed.2d 9 (1974); *Halpern v. Schwartz*, 426 F.2d 102 (2nd Cir. 1970). Section 365 requires that a bankruptcy trustee must decide to assume or reject an executory contract, and, if the trustee elects to assume the contract, all defaults must be cured. The trustee can only assume an executory contract upon the Bankruptcy Court's express order, *see* 11 U.S.C. § 365(a). To do so, the trustee must file a motion and give the parties notice and a reasonable opportunity to be heard. *See* 11 U.S.C. Bankruptcy Rules 6006 and 9014. Before the bankruptcy court orders the trustee to assume the lease, it must determine that the trustee has satisfied the requirements of section 365. *See In re Gold Standard at Penn, Inc.*, 75 B.R. 669 (Bkrtcy.E.D.Pa.1987). Thus, when the bankruptcy court approves an assumption it necessarily finds that no uncured defaults exist.

Lindsley moved for assumption maintaining that it had satisfied all of section 365's requirements. Lone Star received notice of the motion and neither objected nor asserted any defaults. The bankruptcy court approved Lindsley's assumption on July 16, 1985, effectively including the leases in the assets of the estate. *See* 11 U.S.C. § 1141. Subsequently, the bankruptcy court confirmed the reorganization plan ruling the "assets ... shall vest as provided in the plan free and clear of any and all claims, liens, encumbrances, except as provided in the plan." (App. I at 374). Lone Star never asserted a default nor objected to the assumption or reorganization—a fact which is fatal to their counterclaim.

Lone Star's counterclaims V and VI seek relief based on Lindsley's alleged pre-petition defaults. In order for the bankruptcy court to approve Lindsley's assumption, Lindsley was required to cure all defaults. Accordingly, when the bankruptcy court approved Lindsley's assumption of the contract, after giving Lone Star notice and an opportunity to be heard, it necessarily found that Lindsley had satisfied section 365's requirements—*a fortiori* that Lindsley had cured all defaults. Furthermore, the bankruptcy court subsequently ordered that all of the estate's assets, including the leases, vested "free and clear of any and all claims, liens and encumbrances...." (App. I at 376). Because Lone Star's claims should have been raised in Lindsley's bankruptcy, and because the bankruptcy court necessarily found that all defaults were cured and that the leases were

assumed "free and clear," Lone Star's claims based on pre-petition defaults are barred by *res judicata. See, e.g., Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th Cir.1987) (order confirming reorganization plan, disposing of debtors liability, was a final judgement on the merits for *res judicata* purposes, even if guaranty was not actually litigated).

■ In addition to *res judicata,* the Code itself precludes this Court from entertaining Lone Star's claims based on alleged pre-petition defaults. Section 1141(d)(1) of the Code provides:

> Except as otherwise provided in this subsection, in the plan, or in order confirming the plan, the confirmation of the plan ... discharges the debtor from any debt that arose before the date of such confirmation ..., whether or not—
>
> (i) proof of the claim based on such debt is filed or deemed filed under section 501 of this title. ...

11 U.S.C. § 1141(d)(1)

Section 524 provides:

> (a) A discharge in a case under this title (1) Voids any judgement at any time obtained, to the extent that such judgement is a determination of the personal liability of the debtor with respect to any debt discharged under section ... 1141 ... of this title, whether or not discharge of such debt is waived;
>
> (2) operates as an inunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as personal liability of the debtor, whether or not discharge of such debt is waived ...

11 U.S.C. § 524(a)(1), (2).

Sections 1141 and 524 make it abundantly clear that the confirmation of Lindsley's reorganization precludes Lone Star from now asserting claims in this Court based on Lindsley's pre-petition liabilities.

■ Lone Star's assertion that it was unaware of the default until after the bankruptcy does not warrant a different result. First, as the Court has already explained, Lone Star had sufficient notice of these defaults to require it to diligently investigate and assert any possible contingencies or defaults. Merely because Lindsley may have had additional information does not obviate Lone Star's obligation to assert any reasonably foreseeable defaults.[2] Second, even if Lindsley fraudulently concealed its default, Lone Star can not assert that default in this collateral action. *See Unifirst Federal Savings Bank v. American Insurance Company,* 905 F.2d 208 (8th Cir.1990) (bankruptcy claim cannot be raised in a collateral district court proceeding); *Lindsey v. Ipock,* 732 F.2d 619 (8th Cir.1984) (same); *Cf. Woodson v. Robintech, Inc.,* 69 B.R. 77 (E.D.La.1986) (bankruptcy court has exclusive jurisdiction to adjudicate dischargeability). Simply put, Lone Star is seeking relief from the bankruptcy court's orders and the Code's provisions which cured or discharged all of Lindsley's liabilities and defaults. Lone Star's sole remedy is to return to the bankruptcy court and request that it reopen the reorganization and grant whatever relief is appropriate. *See* 11 U.S.C. § 350. Third, the Code contemplates discharge of unmatured or contingent claims which are not asserted. As the Second Circuit explained in *Chateaugay,* unmatured tort, contract and statutory claims are all dischargeable in bankruptcy even if the creditor is unaware of the claim. Regardless, Lone Star had sufficient notice of Lindsley's defaults to justify discharging them under the principles enunci-

---

**2.** Lone Star maintains that the trustee has an absolute duty to assert all defaults. While this is correct, it does not allow the other parties to remain silent if the trustee does not assert those defaults. This would be contrary to the clear import of the rules which provide notice and an opportunity to be heard to all parties to the contract. Moreover, simply because a trustee does not assert a default does not necessarily imply bad faith. For instance, after diligent investigation a trustee may in good faith believe that the debtor is not in default. In that instance, it is incumbent on the other parties to the contract to assert their positions and interests to the Court for resolution. If they do not they can not assert those claims in a civil action outside of bankruptcy.

ated in *Chateaugay* and *National Gypsum*.

For the foregoing reasons, it is ORDERED and ADJUDGED that Lone Star's counterclaims are DISMISSED IN PART TO THE EXTENT THEY SEEK RELIEF ON PRE–PETITION RELEASES OR THREATENED RELEASES OR LINDSLEY'S PRE–PETITION CONDUCT.

C. *Plaintiff's Motion for Protective Order Prohibiting the Redeposition of John Grineison and Alonzo Young*

■ On August 21, 1990, Lone Star took the deposition of Mr. John Greineisen and on July 25, 1990, Lone Star took the deposition of Mr. Alonzo Young. Lone Star has noticed the parties that it wishes to redpose these witnesses. NCL objects to the redeposition of these witnesses and seeks a protective order on the grounds that both were initially thoroughly deposed and that to conduct another deposition would be unnecessary and would involve further expense.[3]

Because the witnesses were extensively deposed concerning all relevant matters and because redposing the witnesses would unduly burden NCL, as well as the witnesses, the Court finds a protective order appropriate under these circumstances. *See Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287 (D.C.Cir.1988) (following extensive deposition of witnesses, it is proper for trial court to prohibit additional discovery), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). It is therefore

ORDERED AND ADJUDGED that Plaintiff's Motion for Protective Order Prohibiting the Redeposition of John Greineisen and Alonzo Young is GRANTED.

**3.** The combined cost of deposing Mr. Greineisen and Mr. Young to NCL was approximately

D. *Field Sampling Cutoff*

■ Lone Star has requested an extension of the Court's November 15, 1991 field sampling cutoff date. In the process of cleaning up the Site, Lone Star claims that the EPA has required continued sampling and that these samples provide the most current information. Lone Star has made no showing, however, that this information is appreciably different, or more accurate, to warrant having the parties expend the considerable expense of evaluating this new study. Therefore, it is ORDERED and ADJUDGED that Lone Star's motion to extend time is DENIED.

It is FURTHER ORDERED AND ADJUDGED that the following schedule, which has been agreed upon by the parties, will control the timing of all remaining pretrial and trial matters:

1. All test data obtained prior to the November 15, 1990 field sampling cutoff date, but not previously exchanged, is to be exchanged on July 15, 1992.

2. Expert reports for all experts expected to testify at trial is to be exchanged by September 18, 1992.

3. Expert discovery is to be completed by November 20, 1992.

4. All dispositive motions are to be filed by January 15, 1993.

5. The attorneys are to meet on May 2, 1993.

6. Joint pretrial stipulations are to be filed on May 10, 1993.

7. Pretrial conference is to be held on May 17, 1993. The attorney for the parties should be prepared to argue the merits of any pending motions at that time.

8. Jury trial is specially set for the six week period beginning May 24, 1993.

$6,000.

182

OCT. '87
ALL ASSETS
AND NAME "LINDSLEY"
SOLD TO WESTLAKE
EXCLUDING DANIA LEASE

NIGHTINGALE DISSOLVED (DEC. '89)

IN AUGUST '89
LEASE TO DANIA PROPERTY
ASSIGNED TO
EVANS ASSET HOLDING CO.
(A 3RD PARTY)

THEN EVANS ASSET
ASSIGNS THE LEASE
OF DANIA PROPERTY
TO 3RD PARTY
NCL

NIGHTINGALE
LIQUIDATING
CORP.

FILES FOR
BANKRUPTCY
(MARCH 11, 1985)
AND BECOMES...
(OCTOBER 1987)

LINDSLEY, INC.

(LINDSLEY
REPRESENTED
BY FRANK BURT)

EXHIBIT 1