In re DIAMOND MANUFACTURING COMPANY, INC., Debtor.

GEORGIA PORTS AUTHORITY, Plaintiff,

v.

DIAMOND MANUFACTURING COMPANY, INC. and W. Jan Jankowski, Trustee, Defendants.

Bankruptcy No. 85–40555. Adv. No. 90–4096.

United States Bankruptcy Court, S.D. Georgia, Savannah Division.

Feb. 22, 1994.

Ezra H. Cohen and Troutman Sanders, Atlanta, GA, Thomas J. Mahoney, Sp. Asst. Atty. Gen., Savannah, GA, for plaintiff.

W. Jan Jankowski, Savannah, GA, and James C. Frenzel, Atlanta, GA, for defendants.

## *ORDER*

JOHN S. DALIS, Bankruptcy Judge.

Defendants, Diamond Manufacturing Company, Inc. ("debtor") and W. Jan Jankowski, Chapter 7 Trustee ("the Trustee") in the underlying case, move for summary judgment as to all of plaintiff's claims in this adversary proceeding pursuant to Federal Rule of Civil Procedure ("FRCP") 56 made applicable by Federal Rule of Bankruptcy

Procedure ("FRBP") 7056.[1] At issue is the respective liabilities of the parties for environmental assessment and remediation costs which have been or may be incurred with respect to certain shipyard property in which plaintiff Georgia Ports Authority ("GPA") is lessor and Debtor is lessee.

Based on the pleadings and exhibits attached thereto, as well as the depositions and affidavits on file, the following facts are undisputed.

In June 1964 GPA leased to Diamond six and one-half acres of land known as Parcels 1 and 2 on a plat of GPA's Ocean Terminals, Savannah, Georgia for a term of twenty years, with lessee having the option to extend the lease for an additional term of twenty years and thereafter for an additional term of ten years. A third parcel (parcel 3) with a frontage on the Savannah River was also included in the aforementioned lease for a term of ten years. After the ten year period, GPA had the right to terminate the third parcel lease at its sole discretion upon one year's written notice to lessee.

The lease contains two provisions relevant to this litigation. Paragraph VI provides in pertinent part:

> During the term hereof Lessee shall, at Lessee's own expense, promptly observe and comply with all present or future laws, rules, requirements, orders, directions, ordinances and regulations of the United States of America or of the State, County or City governments, or of any other municipal, governmental or lawful authority whatsoever, affecting the demised premises ... whether the same are in force at the commencement of the term hereof or at any time in the future may be passed, enacted or directed; and Lessee shall pay all costs, expenses, claims, losses, damages, fines and penalties, including reasonable counsel fees, that may in any manner arise out of or be imposed because of the failure of lessee to comply with these covenants.

Paragraph VII(B) provides:

> Lessee also agrees to indemnify and hold harmless the Lessor from loss, damage or injury from any act or omission of the Lessee, its employees or agents, to the person or property of the parties hereto and their employees and to the person or property of any other person or corporation, while on or about said premises.

In 1981 GPA terminated the lease on parcel 3 in order to construct "Berth 13" on the property. Parcels 1 and 2 remained under lease to Diamond. During construction on parcel 3 in March 1983 GPA's contractor discovered a pocket of oily soil. The United States Coast Guard was consulted about possible contamination into the Savannah River and GPA took steps, including the installation of an oil boom, to prevent any migration of the oil. The oily soil was removed, mixed with other material, and used as a subsurface for a paved over area. During GPA's excavation, a two inch pipeline which ran from Diamond's leasehold onto parcel 3 and which had previously been used for the transmission of oil was dug up and removed. GPA cut the pipeline and capped it at the boundary of Diamond's leasehold. GPA made no demand or claim against Diamond with respect to this contamination.

GPA had firsthand knowledge of the operations of Diamond and Debtor on the site through observations made by Wesley Allen, GPA's Director of Engineering and Construction, who had been on the property from time to time over the years.

At the end of 1983, Diamond exercised its option to extend the Lease of Parcels 1 and 2 for an additional twenty years. In April 1985, in conjunction with the 1983 extension, GPA and Diamond entered into a first "Amendment to Lease" which established a rental rate for the second lease term and granted GPA an easement on the property. All other terms and conditions of the original 1964 lease, including the quoted provisions, remained unchanged.

On August 29, 1985 Diamond filed a petition under chapter 11, title 11, United States Code, initiating this bankruptcy case.

On August 26, 1988 debtor's chapter 11 case was converted to chapter 7. W. Jan Jankowski was appointed Trustee. On October 24, 1988 the Trustee filed a Motion for

---

1. The prebankruptcy entity Diamond Manufac- turing, Inc. will be referred to as "Diamond".

Authority to Accept Executory Contract which stated, in pertinent part:

> Trustee has tendered to GEORGIA PORTS AUTHORITY all past-due rentals.... Trustee is unaware of any other defaults under the terms of said lease. Trustee has on deposit, in a bankruptcy account, sufficient funds to cure any other defaults.... Trustee is unaware of any other defaults under the terms of said leases and is in a position to cure any other defaults if they arise.

After notice, GPA did not oppose the Trustee's motion. By Order filed December 15, 1988, I approved assumption of the lease.

In January 1990, Westinghouse Environmental and Geotechnical Services, Inc. ("Westinghouse") prepared a preliminary environmental assessment of debtor's leasehold called the Phase 1 Report at the request of Savannah Economic Development Corporation which had a client interested in purchasing the leasehold. The Phase I Report identified several potential environmental problems on the site.

In February 1990 in connection with a prospective purchase of the leasehold, Jered Brown Brothers, Inc. retained Westinghouse to prepare a Phase II Report to determine if any environmental contamination was present on debtor's leasehold. That report was submitted to Jered Brown Brothers, Inc. in March 1990, who provided it to GPA, who in turn, furnished the report to the Environmental Protection Division ("EPD") of the Georgia Department of Natural Resources.

By letter dated April 12, 1990 the EPD wrote GPA's Director of Engineering and Construction that GPA should authorize an environmental consultant to develop a plan and schedule for site remediation.

On May 29, 1990, GPA filed this adversary proceeding. Defendants filed their answer and a counterclaim on June 27, 1990.

On March 29, 1991, based on an additional report submitted by GPA on the release of contaminants on the property, the EPD entered an Administrative Order finding that the releases occurred as a result of Diamond's activities. The Administrative Order, which was issued after the Trustee failed to enter into a proposed Consent Order, directed the Trustee to engage in comprehensive assessment and remediation of the property.

Pursuant to a timely petition, the Trustee contested the Administrative Order. An administrative hearing originally scheduled for December 3, 1991 was stayed, however, by a joint request from all parties, in order to allow the Trustee to employ Atlanta Testing and Engineering ("Atlanta Testing") to prepare a final site assessment and remediation plan for the site. Employment of Atlanta Testing was approved by this court in November 1991.

As a result of the activities of Atlanta Testing, the Trustee submitted a Preliminary Corrective Action Plan to EPD on February 23, 1993. A Revised Corrective Action Plan was submitted on September 17, 1993. The EPD responded to the revised plan by letter dated December 7, 1993 in which it indicated significant additional cleanup would be required under the Administrative Order.

Defendants filed the present motion for summary judgment November 17, 1993 as to all claims raised in plaintiff's complaint. Defendants have not moved for summary judgment on their counterclaim.

Plaintiff's complaint contains the following relevant allegations:

1. The lease entered into between GPA and Diamond contains the indemnity provision paragraph VI, *supra.*

2. Hazardous Waste contamination was found on the property subsequent to February 23, 1990.

3. The Westinghouse Phase II Report shows Hazardous Waste contamination which violates state and federal standards.

4. Defendant Diamond has caused the property to become contaminated over the 39 years (since 1951) in which it has been in exclusive possession and control of the property.

5. Defendant Diamond is solely responsible for the release of the hazardous contamination.

6. The EPD has determined the contamination presents imminent harm to the pub-

lic health and safety and has directed an environmental clean-up of the property.[2]

7. Defendant Diamond's contamination constitutes a violation of the rules and regulations adopted to enforce the "Georgia Hazardous Waste Management Act," O.C.G.A. § 12–8–60 et seq.[3]

Plaintiff's prayer for relief requests

1. that the Trustee be restrained from paying any further claims in the bankruptcy case and thereby depleting the estate;

2. that the Trustee be required to undertake the environmental clean-up directed by the EPD at the sole expense of the bankrupt estate;

3. that the expense of assessing the environmental damage and conducting the environmental cleanup be paid by the bankruptcy estate and/or the Trustee jointly and severally.

In response, defendants' answer[4] and counterclaim assert

1. that Diamond's possession of the leasehold was not continuous and exclusive, plaintiff being in possession of a portion of the premises from time to time;

2. that if the property is contaminated, defendant would not be the sole cause of any such contamination; a substantial amount would have been caused by plaintiff for which it would be solely responsible for correction thereof;

3. that much of the alleged contamination may have entered from adjacent property owned by and under the sole control of plaintiff, for which plaintiff would be solely responsible.

Defendants' counterclaim seeks to have the costs of environmental assessment and remediation shared by both plaintiff and defendants to the extent to which each may be responsible for any contamination.

As defendants have moved for summary judgment on all of plaintiff's claims, I must necessarily determine what claims are at issue in this adversary. Defendants state in their Reply Brief that "In this Adversary Proceeding, the Plaintiff attempts to require the Trustee to expend Estate funds for the cleanup of the Property *only* by seeking to enforce indemnity and other contractual provisions contained in the Lease between the Plaintiff and the Debtor." Accordingly, defendants' motion argues that such indemnity provisions are not enforceable against the Trustee and Debtor based on principles of res judicata or collateral estoppel and on contractual interpretation of the indemnity provisions. A liberal reading of the allegations and prayer for relief contained in plaintiff's complaint reveals, however, that plaintiff seeks a determination of both the parties liabilities as to each other under the indemnity provisions of the lease and a further declaration of the liability of the parties under the Georgia hazardous waste statutes. Defendants' arguments for summary judgment therefore are limited and will not reach all the issues present in this adversary.

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure (FRCP) 56, made applicable by Federal Rule of Bankruptcy Procedure (FRBP) 7056. "[A] party moving for summary judgment bears the initial burden of showing by reference to the record, that there is not a genuine issue of material fact." *Velten v. Regis B. Lippert, Intercat, Inc.*, 985 F.2d 1515, 1523 (11th Cir.1993); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[I]f this showing is made, the burden shifts to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes sum-

---

**2.** At the time this adversary was filed, the EPD had not yet determined pursuant to Administrative Order that debtor was responsible for the contamination.

**3.** The litigation in this adversary now largely centers around the Georgia Hazardous Site Re-

sponse Act, O.C.G.A. § 12–8–92 et seq., enacted in 1992 after this adversary proceeding had begun.

**4.** Pursuant to Order dated February 19, 1993 defendants amended their answer to include and plead the affirmative defenses of res judicata and collateral estoppel.

mary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). "When a motion for summary judgment is made and supported as provided in this rule [FRCP 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FRCP 56(e). The evidence is reviewed "in a light most favorable to the opponent of the motion. All reasonable doubts and inferences should be resolved in favor of the opponent." *Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1502 (11th Cir.1985) *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).

■ Under the indemnity provisions of the lease noted *supra,* debtor is required to comply with all laws, regulatory orders, etc., including future laws. In addition, debtor covenants to indemnify and hold plaintiff harmless for any damage to persons or property resulting from debtor's use of the leasehold. The basic premise of plaintiff is that these provisions bind debtor to compliance with applicable environmental regulations and laws and that any failure to abide by such constitutes a default under the lease which triggers a right to indemnity for any damage that plaintiff might suffer as a result of such default.

Defendants assert that any claim of default based on environmental contamination of the leased property should have been raised in prior contested matters before me concerning assumption of the lease by debtor during the chapter 11 case or assumption of the lease by the Trustee.[5] According to defendants, because plaintiff failed to assert any claim of default based on environmental contamination in those prior contested matters, by virtue of the doctrine of res judicata plain-

tiff cannot now seek to hold defendants responsible under the terms of the lease indemnity provisions for any costs associated with pre-assumption contamination on the property.[6]

Defendants rely on *NCL Corp. v. Lone Star Building Centers (Eastern), Inc.,* 144 B.R. 170, 178–80 (S.D.Fla.1992) to establish that § 365(b) of the Bankruptcy Code requires, prior to the assumption of any executory contract, the allegation of any default then existing; if such default is not alleged, then the entry of an order approving the lease necessarily determines that no defaults exist. Plaintiff disputes this interpretation of the effect of § 365. I find the *NCL Corp.* interpretation valid.

Section 365 provides in pertinent part:

(a) Except as provided in ... subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee, will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365.

In *NCL Corp.,* plaintiff NCL Corp., as lessee of a contaminated site, sued the owner

---

**5.** In analyzing defendants' argument I only address what effect the Trustee's assumption of the lease has on plaintiff's present ability to assert an indemnification claim against defendants. I do not consider what effect, if any, the assumption of the lease by the debtor during the chapter 11 case might have on plaintiff.

**6.** Defendants contend that the contamination on the property existed pre-assumption. This accords with averments in plaintiff's complaint that defendants caused the contamination over 31 years in which Diamond and Debtor were in possession of the property. Although defendants allege that no contamination has occurred on the property post-assumption, nothing has been presented supporting that contention.

and lessor, Lone Star Building Centers, Inc. ("Lone Star") for cleanup costs it had accrued and would continue to accrue. Lone Star filed a counterclaim based on an indemnity provision in a lease with Lindsley Stores, Inc. ("Lindsley"), NCL Corp.'s assignor. NCL Corp. moved to dismiss. The history of the site was as follows: Lone Star, as owner of the site, used the property to "dip treat" wood between 1962 and 1979 as part of a lumber and building supply business. In 1979, Lone Star leased the property to Lindsley Stores, Inc. ("Lindsley") "on the condition that [lessee] take responsibility for the chemicals and indemnify Lone Star for any liability incurred if [lessee] failed to properly maintain the site." *NCL Corp., supra,* at 177. During its term as lessee, Lindsley filed a Chapter 11 bankruptcy, assumed the leases, and obtained a discharge. Although Lone Star received notice of Lindsley's proposed assumption of the lease, it neither objected nor asserted any defaults. In support of its counterclaim against NCL Corp., Lone Star argued that Lindsley's site management violated state and Federal environmental regulations, and that as Lindsley did not make any cure payments to Lone Star at the time it assumed the leases, Lindsley assumed all uncured defaults and passed on liability for those defaults to NCL Corp. *Id.* at 173, 177–78.

The court rejected Lone Star's argument that § 365(b) requires that uncured pre-assumption defaults become "assumed" post-assumption obligations. *Id.* at 178. The court analyzed the operation of § 365 as follows:

> Section 365 requires that a bankruptcy trustee must decide to assume or reject an executory contract, and, if the trustee elects to assume the contract, all defaults must be cured. The trustee can only assume an executory contract upon the Bankruptcy Court's express order, *see* 11 U.S.C. § 365(a). To do so, the trustee must file a motion and give the parties notice and a reasonable opportunity to be heard. *See* 11 U.S.C. Bankruptcy Rules 6006 and 9014. Before the bankruptcy court orders the trustee to assume the lease, it must determine that the trustee has satisfied the requirements of section

> 365.... Thus when the bankruptcy court approves an assumption it necessarily finds that no uncured defaults exist. (citation omitted).

*Id.* at 179. Accordingly, the court found that "[b]ecause Lone Star's claims should have been raised in Lindsley's bankruptcy, and because the bankruptcy court necessarily found that all defaults were cured and that the leases were assumed 'free and clear,' Lone Star's claims based on pre-petition defaults are barred by res judicata." *Id.* at 179–80.

■ In *NCL Corp.,* Lone Star contended that when a trustee assumes a lease "it becomes liable for the performance of the entire contract, as if bankruptcy had never intervened." *Id.* at 178 (quoting *In re Airlift International, Inc.,* 761 F.2d 1503, 1508 (11th Cir.1985)). Plaintiff also argues that when a trustee assumes a lease, the trustee assumes all the bankrupt's liabilities and must live with that "statutory gamble" if the determination that the lease's benefits outweigh its detriments later proves to be wrong. *See* Plaintiff Reply Brief, Section II. Implicit in plaintiff's argument is that a part of the trustee's "gamble" taken when deciding whether to assume or reject a lease is the risk that the estate post-assumption may have to cure undisclosed pre-assumption defaults which could have been asserted at the time of election, but were not. The *NCL Corp.* court rejected that argument noting that the only cases cited by Lone Star for that proposition, involved a debtor's "prospective obligations" under assumed leases, not the debtor's liability for pre-assumption defaults. Similarly, plaintiff has cited only one case, *In re Leon's Casuals Co.,* 122 B.R. 768 (Bankr.S.D.Ala.1990) in which a court has required payment of a pre-assumption default not raised at hearing on assumption or covered by a pre-assumption consent order. *Leon's Casuals* is distinguishable from the present case. In that case, both parties were aware of the existence of the pre-assumption default which the court required to be cured post-assumption, even though it was not part of the consent order entered into by the parties covering cure of defaults. While I agree that a nonbankrupt contracting par-

ty, in this case a lessor, should be entitled to the full benefit of the pre-petition bargain, this simply means that "'a debtor may not assume the favorable aspects of a contract ... and reject the unfavorable aspects of the contract.'" *Department of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1472 (4th Cir.1990) (quoting *Lee v. Schweiker*, 739 F.2d 870, 876 (3d Cir.1984)). This does not mean that a nonbankrupt party should be permitted to let a trustee assume a contract or lease without asserting a possible default then existing, when that default could have been asserted pre-assumption, only to later assert the default post-assumption and require cure based upon the assumption. Under § 365, the burden is on a trustee to decide whether to assume or reject an executory contract or unexpired lease. 11 U.S.C. § 365(a). A trustee's decision is subject to court approval and is reviewed under the traditional "business judgment" standard. *See In re Gardinier, Inc.*, 831 F.2d 974, 975 n. 2 (11th Cir.1987). The § 365 election permits a trustee to either escape burdensome obligations of a debtor or to continue performance on a contract which will benefit the estate. *See In re Brada Miller Freight System, Inc.*, 702 F.2d 890, 893–94 (11th Cir. 1983); 1 *Norton Bankruptcy Law and Practice 2d* § 23.08 (W. Norton, ed. 1993). A trustee must have all pertinent available information before him in making this decision. The existence of a default and liability attaching thereto is a significant consideration in a trustee's weighing the benefits and burdens of an unexpired lease or executory contract and in any election made under § 365.

In this case, at issue is an indemnity claim for environmental site assessment and remediation costs. In the Revised Correction Action Plan submitted by the Trustee to the EPD, the Trustee estimated the proposed remediation cost of the site to run from $168,000.00 to $323,000.00. However, the EPD's response to the Trustee's plan stated that the proposed levels of remediation were inadequate. The bankruptcy estate has already spent over $500,000.00 in assessment costs. The exact portion of costs for which the estate might be liable to GPA under the lease indemnity provisions is uncertain. Nevertheless, it is clear that the

cost of environmental liability and the litigation it entails is a significant factor which any trustee would consider in determining whether to assume or reject a lease. I find nothing in the Bankruptcy Code or case law which would mandate that a trustee assume the risk that post-assumption the trustee might be required to cure or pay for a default claim which could have been asserted prior to assumption but was not.

The nonbankrupt party bears a burden to assert any defaults prior to assumption. In general, this accords with the operation of the § 365 burden of proof. *In re Rachels Industries, Inc.*, 109 B.R. 797 (Bankr.W.D.Tenn.1990).

> In a proceeding under § 365, the party moving to assume a lease has the ultimate burden of persuasion that the lease is one subject to assumption and that all requirements for assumption have been met.... However, ... [the nonbankrupt lessor], in this instance has the initial burden of showing defaults and that those defaults have been properly noticed to the lessee [the bankrupt party]. If defaults are established by the proof, then the burden shifts back to the debtor to provide satisfactory proof that the defaults have either been cured or will be promptly cured and that there would be adequate assurance of future performance.... However, if the proof does not establish any default in an executory contract or unexpired lease, the elements of § 365(b)(1) are not required to be proven by the debtor.

*Id.* at 802. Plaintiff asserts that in this case the Trustee effectively shifted the burden of proof requirements by asserting a default in rent and his ability to cure any future defaults which might arise from existing assets in the bankruptcy estate account. Thus, plaintiff contends that the Trustee by the representations in his motion that he would meet the requirements of § 365(b)(1) withdrew the possible existence of any unidentified default from the issues before the court. I disagree. Plaintiff's motion states in pertinent part:

> Trustee has tendered to GEORGIA PORTS AUTHORITY all past-due rent-

als.... Trustee is unaware of any other defaults under the terms of said lease. Trustee has on deposit, in a bankruptcy account, sufficient funds to cure any other defaults ... Trustee is unaware of any other defaults under the terms of said leases and is in a position to cure any other defaults if they arise.

A fair reading of the motion establishes that the Trustee stated he had cured the only default of which he was aware (certain past due rentals) and was soliciting from plaintiff, the other party to the lease, any disagreement with the Trustee's position as to the existence or cure of defaults. The Trustee's reference to his ability to cure other defaults must be read as his willingness to cure any defaults which plaintiff might assert prior to assumption in response to his motion. I do not find that the Trustee was agreeing to cure post-assumption any unasserted pre-assumption default which later might be identified.

■ Plaintiff's argument would also mandate that once a trustee raises a default to be cured, the burden on the nonbankrupt party to raise defaults would effectively disappear. This notion was rejected by the *NCL Corp.* court's recognition that both the nonbankrupt party and the trustee have independent, but dual responsibilities of asserting defaults.[7]

Lone Star maintains that the trustee has an absolute duty to assert all defaults. While this is correct, it does not allow the other parties to remain silent if the trustee does not assert those defaults. This would be contrary to the clear import of the rules which provide notice and an opportunity to be heard to all parties to the contract. Moreover, simply because a trustee does not assert a default does not necessarily imply bad faith. For instance, after diligent investigation a trustee may in good faith believe that the debtor is not in default. In that instance, it is incumbent on the other parties to assert their positions

and interests to the Court for resolution....

*NCL Corp., supra,* at 180 n. 2.

Moreover, I find that, in situations comparable to the one at hand, the nonbankrupt party has superior knowledge and is therefore in a better position to assert defaults. In most cases, a chapter 7 trustee simply will not have the intimate knowledge of the debtor's performance or defaults under the contract or lease at issue that the nonbankrupt party would have. In addition, when the debtor is a lessee of an unexpired lease of nonresidential real property, a chapter 7 trustee is faced with strict time constraints in making his § 365 election. If the trustee does not assume or reject such a lease within sixty days of the order for relief or does not request additional time from the court within that sixty day period, the lease is deemed rejected, and the trustee must surrender the property to the lessor. 11 U.S.C. § 365(d)(4). These factors warrant a burden on the nonbankruptcy party to assert defaults pre-assumption.

■ Having determined that the premise of the decision in *NCL Corp.* on which defendants' argument rests is valid,[8] I now resolve whether the requirements for the application of res judicata have been met in the affirmative. Res judicata or claim preclusion bars the relitigation of claims that were litigated or could have been litigated in a prior proceeding. *Pelletier v. Zweifel,* 921 F.2d 1465, 1501 (11th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991); *McKinnon v. Blue Cross and Blue Shield,* 935 F.2d 1187, 1192 (11th Cir.1991). In applying res judicata three essential elements must be satisfied to bar a claim: (1) there must be a final judgment on the merits rendered by a court of competent jurisdiction, (2) the party against whom res judicata is asserted must be the same as, or in privity with, a party to the prior action, and (3) the

---

7. In general, I find the shifting burden of proof set forth in *Rachels Industries, Inc.* valid. However, I would modify that burden to the extent it fails to recognize the trustee's burden as set forth in *NCL Corp.*.

8. That the court in *NCL Corp.* also rested its decision on the ground that Lindsley's liability was discharged in its bankruptcy does not affect the validity of its reasoning in regard to the operation of § 365(b) in requiring assertion of defaults.

same cause of action must have been involved in both actions. *See Pelletier, supra,* at 1501; *Concordia v. Bendekovic,* 693 F.2d 1073, 1076 (11th Cir.1982). My order filed December 15, 1988 approving the Trustee's assumption of the lease conclusively determined that no uncured pre-assumption defaults existed. As no further issues remained between the parties as to defaults under the lease that decision was a final judgment on the merits. *NCL Corp., supra,* at 178–180; *see generally* Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4432. Plaintiff in the instant adversary proceeding is the same party who was the respondent in the contested matter relating to assumption of the lease. Finally, plaintiff's claim for indemnification, to the extent based on pre-assumption environmental contamination on the estate's leasehold, was at issue in the lease assumption proceedings. As the present adversary proceeding arises out of the same nucleus of operative fact and is based on the same factual predicate which was at issue in the former lease assumption action, the two proceedings involve the same cause of action for res judicata purposes. *See Pelletier, supra,* at 1502.

Plaintiff makes several arguments that res judicata is inapplicable. Plaintiff contends that "the Trustee's res judicata argument is essentially an argument that the lessor waived its rights to cure under Section 365." Plaintiff Brief, Section IV. Plaintiff then argues waiver is not established in this case under Georgia law. Res judicata and waiver are distinct concepts and doctrines. This distinction is recognized by the case cited by plaintiff as supporting its proposition. *See Leon's Casuals, supra,* at 771 (waiver applies to parties' agreement, not to statutory duty of § 365). Defendants have not asserted waiver as a ground for their motion for summary judgment.

Plaintiff advances a more substantive argument that its indemnity claim cannot be barred by res judicata as it was unaware of the environmental contamination at issue until it received the Westinghouse Phase II Report in 1990. Res judicata operates to bar claims which *could have been* asserted in a prior proceeding. The *NCL Corp.* court held that res judicata barred the owner's claims against the lessee notwithstanding the owner's assertion that it was unaware of the default until after the lessee's bankruptcy case was closed. 144 B.R. at 180. The court found that even if the property owner did not have actual knowledge of the contamination, it had knowledge of the site's potential condition by virtue of its awareness of the lessee's operations on the property and had the ability to inspect the property. *Id.* at 177. This was sufficient to put the owner on notice and require diligent investigation and assertion of possible defaults. *Id.* at 180. In this case, plaintiff was aware of the operations conducted by debtor from the visits made on the site by its Director of Engineering and Construction. Moreover, the events surrounding the "1983 incident" on parcel 3 were sufficient to make plaintiff aware that contamination was potentially present on parcels 1 and 2 (debtor's leasehold). Prior to 1981, debtor had all three parcels under lease. The third parcel was returned to plaintiff in that year in order for plaintiff to construct a berth on that property. During the course of the excavation, contamination in the form of a pocket of "oily soil" was found on parcel 3. Plaintiff contends that discovery of contamination on parcel 3, no longer part of debtor's leasehold, cannot support an inference of notice of contamination on parcels 1 and 2. I disagree. As parcel 3 was part of debtor's leasehold until 1981, a reasonable inference from discovery of contamination on that parcel should be made that the activities of debtor which presumably caused the parcel 3 contamination may also have caused contamination on adjacent parcels 1 and 2. This conclusion is bolstered by plaintiff's discovery of the possible source of the contamination, a two-inch pipeline used to transmit oil from Diamond's leasehold parcels 1 and 2 onto parcel 3. I find that even if plaintiff did not become fully aware of the pre-assumption contamination until 1990, events prior to the lease assumption provided sufficient notice to inquire as to the possibility of contamination on the debtor's leasehold and assert any possible lease default in connection therewith.

■ Plaintiff also contends that res judicata cannot apply to bar a claim of default for pre-assumption contamination because at the time the lease was assumed, it had not sent notice of default to debtor or the Trustee. Apparently, plaintiff contends that the only "default" which could be barred by res judicata is one that is formally noticed by the lessor under the lease provisions. This contention is inconsistent with the previously discussed principle that res judicata operates to bar any defaults of which a nonbankrupt party had sufficient notice to require reasonable investigation and make diligent inquiry, and which were not asserted. It also misconstrues the operation of the lease provisions themselves. Under the 1964 lease, a default is simply a failure to perform a covenant contained therein. No provision in the 1964 lease makes a "default" contingent on being declared by notice.

■ Plaintiff also contends that if the doctrine of res judicata applies with respect to my order approving assumption, it would also preclude the Trustee's later abandonment or rejection of the lease due to my finding that the lease was a valuable asset to the estate. Plaintiff cites no authority for this proposition and I find it to be meritless. The Bankruptcy Code contemplates that a lease can be rejected after it is assumed. 11 U.S.C. § 365(g). Further, the value or burden of an asset to the estate is one which is subject to change over the course of the bankruptcy case. Unlike § 365 in which a trustee has a set time limit in making a decision in which to assume or reject a lease, 11 U.S.C. § 554, governing abandonment, imposes no specific timetable on a trustee. Case law merely requires that the trustee act within a "reasonable" time. 4 *Collier on Bankruptcy* ¶ 554.02, 554–5 to –6 (L. King 15th ed. 1993). Moreover, differences exist between the two actions in terms of who may bring the motion and parties who are noticed. Under FRBP 6006 governing § 365 elections, only a trustee or a party to the contract may institute an election proceeding. Under FRBP 6007 governing § 554 motions, however, a trustee or any party in interest can move to have property abandoned. In addition, under FRBP 6006 notice is only mandated to the U.S. Trustee and the other party to the contract, but FRBP 6007 mandates notice, among others, to all creditors. A trustee may abandon a lease pursuant to § 554 after assuming it under § 365 despite a finding at the time of assumption that it was a valuable asset to the estate.

■ Finally, plaintiff contends that res judicata is not applicable with regard to § 365 elections because those proceedings are summary in nature and not meant to adjudicate disputes between the parties regarding defaults. *In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir.1993). I must disagree with that limitation on the nature of § 365 proceedings. The judicial review of the trustee's decision on whether to assume or reject a particular lease or contract under § 365(b) requires the court to make a fundamental determination of the existence or nonexistence of defaults. If such defaults exist, the court cannot approve the assumption unless the cure requirements of § 365 are met. Further the exercise of good business judgment in a § 365 election mandates a weighing by the trustee of the effect of existing defaults.

■ Having disposed of plaintiff's arguments on the applicability of res judicata in this case, I find that by virtue of plaintiff's failure to assert, prior to the Trustee's assumption of the lease, a default under the lease indemnity provisions regarding pre-assumption contamination then existing, it is now barred from asserting such a claim of default and for indemnity for any assessment and cleanup costs of such pre-assumption contamination in this adversary proceeding.[9]

■ Nevertheless, plaintiff contends that any application of res judicata is limited to pre-assumption defaults and does not bar its assertion of post-assumption defaults. Specifically, plaintiff contends that as the lease requires debtor to comply with future regulatory orders, any future violation of the EPD Administrative Order by debtor would be a breach of the lease. Plaintiff further contends that if it incurs any remediation ex-

9. I do not address defendants' argument as to collateral estoppel.

penses from any such Administrative Order violation, the Trustee will be in breach of the lease indemnity provision. Therefore, argues plaintiff, res judicata cannot apply to waive or excuse (1) any future failure by the Trustee to comply with the EPD Administrative Order, or (2) any future failure by the Trustee to indemnify plaintiff for expenses which it may in the future incur as a result of the Trustee's violation of the Administrative Order because any such failures would be defaults occurring after the Trustee's assumption of the lease.

■■■■ I agree with plaintiff's contentions in limited part. Assuming the enforceability of the lease provisions as they relate to environmental laws, any future violations of a final EPD Administrative Order issued against plaintiff requiring them to remediate the property would constitute a breach of the lease. It is recognized that such a default could not have been asserted pre-assumption by plaintiff. Nevertheless, to the extent that any future violation of an EPD order is directly linked to pre-assumption environmental contamination on the property, plaintiff is barred from recovering the costs of assessment and cleanup post-assumption. Any other result would effectively allow plaintiff to convert a pre-assumption barred claim of indemnity to a post-assumption allowed claim. This is impermissible. However, to the extent that plaintiff may be able to assert a remedy different from costs of assessment and cleanup for a post-assumption breach of such a final EPD Order, i.e. for termination of the lease, it is not barred by res judicata. Likewise, to the extent that plaintiff can directly link any future default of a final EPD order by defendants to post-assumption contamination, or can prove post-assumption contamination by defendants apart from any violation of a final EPD order, any claim for costs of assessment and cleanup of such post-assumption contamination would not be barred.

In its complaint, plaintiff seeks an adjudication of liability for costs of assessment and remediation of the property. Based on the foregoing, I have determined that the doctrine of res judicata bars plaintiff from asserting a claim *as to those costs* under the lease provisions with regard to both pre-assumption defaults and to post-assumption defaults resulting from a future violation of a final EPD order to the extent linked to pre-assumption contamination. Therefore, to that extent, I find that defendants are entitled to summary judgment on plaintiff's claim for those costs under the lease provisions.

As plaintiff has remaining a potential claim for indemnification under the lease for assessment and cleanup costs based on any proved post-assumption contamination, I now turn to defendants' second argument regarding the enforceability of the indemnity provisions.

■■■■ Defendants contention that the lease indemnity provisions are not enforceable is initially based on section 107(e) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended, 42 U.S.C. § 9601 et seq. In pertinent part, section 107(e) of CERCLA states:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or a threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e). Defendants contend that this provision was intended to protect federal resources and was meant to prohibit the invocation of indemnity agreements when that would limit the number of potentially responsible parties available to contribute to remediation and would threaten the ability of private parties alone to fund a response. I disagree. Federal Circuit Courts of Appeals considering the issue have uniformly interpreted § 9607(e) to allow for private parties to distribute the risks and responsibilities of potential CERCLA response costs among themselves. *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10, 15 (2d Cir.1993); *John S. Boyd Co. v. Boston Gas Co.,* 992 F.2d 401, 405 (1st Cir.1993); *United States v.*

*Hardage*, 985 F.2d 1427, 1433 (10th Cir. 1993); *AM International, Inc. v. International Forging Equipment Corp.*, 982 F.2d 989, 995 (6th Cir.1993); *Jones–Hamilton Co. v. Beazer Materials and Services, Inc.*, 973 F.2d 688, 692 (9th Cir.1992). Such private allocations are permitted because they do not transfer a party's ultimate liability to the government and, therefore, the number of potentially responsible parties cannot be diluted by such agreements. *AM International, Inc., supra*, at 994–995. I do not find that remediation policies behind CERCLA or the Georgia hazardous waste statutes would prohibit enforcement of the parties indemnity agreement as suggested by defendants.[10]

▮▮▮ Defendants also contend that the indemnity provisions in the lease cannot be enforced because they are too vague to cover allocation of environmental remediation costs. According to defendants, the indemnity provision cannot be held to cover liabilities based on environmental statutes passed years after the lease was signed and which were not contemplated by the parties.[11] Defendant argue that only indemnity provision specifically referencing CERCLA or CERCLA type liability should be enforced. In determining the enforceability of indemnity provisions governing environmental remediation costs state law governs. *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1460 (9th Cir.1986); *Commander Oil Corp. v. Advance Food Service Equipment*, 991 F.2d 49, 51 (2d Cir.1993). Under Georgia law, a court must look to the language of the indemnity agreement and determine if the agreement is clear. If the language is unambiguous, the court need look no further. *Carsello v. Touchton*, 231 Ga. 878, 880, 204 S.E.2d 589, 591–92 (1974). In this case, paragraph VI of the lease provides in pertinent part that

> During the term hereof Lessee shall, at Lessee's own cost and expense, promptly

observe and comply with *all present or future laws*, rules, requirements, orders . . . whether the same are in force at the commencement of the term hereof or *at any time in the future* may be passed, enacted, or directed; and Lessee shall pay all costs, expenses, claims . . . that may *in any manner* arise out of or be imposed because of the failure of Lessee to comply with these covenants.

Similarly broad indemnity language is contained in paragraph VII.

> Lessee also agrees to indemnify and hold harmless the Lessor from loss, damage or injury *from any act or omission* of the lessee . . . to the person or property of the parties hereto . . . .

Despite defendants arguments, these provisions are not ambiguous. Although the provisions may be couched in general risk allocation language, the parties clearly agreed that lessee would be bound to compliance with *all* laws which were either currently existing at the time of entering the lease or which might be enacted during the following 50 years in which Diamond might be lessee. This bargain necessarily contemplates compliance with completely unforeseen laws, including environmental laws.

▮▮▮ That no environmental statute was expressly mentioned in the indemnity provision or that the environmental statutes for such hazardous waste cleanup costs were not enacted at the time the lease was signed does not render the provision unenforceable. The only Georgia decision addressing the issue is *Georgia Ports Authority v. Central of Georgia Railway Co.*, 135 Ga.App. 859, 219 S.E.2d 467 (1975). In that case an indemnity provision holding the Railway harmless for "any and all claims" resulting from negligence or "other causes" was held to cover

---

**10.** Most of defendants' arguments concerning enforceability of the indemnity provisions reference case law concerning CERCLA liability. CERCLA is not involved in this case. At issue is the parties liability under the Georgia Hazardous Waste Management Act, O.C.G.A. § 12–8–60 et seq., and the Georgia sister statute to CERCLA, the Georgia Hazardous Site Response Act, O.C.G.A. § 12–8–92 et seq. As no Georgia case law has interpreted an indemnity provision relating to liability under its hazardous waste stat-

utes, case law construing such provisions in the context of CERCLA liability is persuasive authority. Georgia does not have a statutory provision comparable to 42 U.S.C. § 9607(e).

**11.** CERCLA was enacted in 1980. The Georgia Hazardous Waste Management Act and the Georgia Hazardous Site Response Act were enacted in 1979 and 1992 respectively.

liability the Railway accrued under the Federal Employer's Liability Act, notwithstanding the failure to expressly refer to that statute in the indemnity agreement. 135 Ga.App. at 862, 219 S.E.2d at 470. However, in that case, the parties were held to have known of the existence of the statute at the time the agreement was entered. *Id.* Therefore, it is of little guidance in interpreting the enforceability of an indemnity provision relating to a statute enacted years after the indemnity agreement. However, federal courts have upheld pre-CERCLA indemnity agreements under various state laws when they contain broad indemnity language similar to that used here. For example, an 1970 agreement to "comply with all applicable Federal, State, and local laws ... and to indemnify against all losses resulting from any failure ... to do so" was held to apply unambiguously to CERCLA clean-up costs. *Jones–Hamilton Co. v. Kop–Coat, Inc.*, 750 F.Supp. 1022, 1027–28 (N.D.Cal.1990) *aff'd in pertinent part sub nom.*, 959 F.2d 126 (9th Cir.1992). Similarly a 1975 agreement to "assume any and all liabilities" arising out of a transfer of assets was held to cover CERCLA liability. *Purolator Products Corp. v. Allied–Signal, Inc.*, 772 F.Supp. 124, 131–132 (W.D.N.Y.1991).

> In view of the breadth of its terms, the fact that the indemnity agreement was entered into prior to the enactment of CERCLA does not prevent its being applied to CERCLA liability. Although parties could not be expected to have foreseen CERCLA before it was enacted, an agreement which is broad enough to encompass any and all claims ... has been held to cover CERCLA liability.

*Id.* at 132. The principle recognized by both *Jones–Hamilton* and *Purolator Products* is that pre-CERCLA indemnity agreements are given effect when the language is sufficiently broad and inclusive that it fairly contemplates the assumption of unforeseen future liabilities. *See also, American National*

*Can Co. v. Kerr Glass Manufacturing Corp.*, 1990 WL 125368 (N.D.Ill.) *aff'd on reconsideration*, 1990 WL 129657 (1990) (1969 indemnity provision "for any claim of any kind or nature whatsoever" applies unambiguously to CERCLA costs) (Ill. law); *FMC Corp. v. Northern Pump Co.*, 668 F.Supp. 1285, 1291–92 (D.Minn.1987) (1976 release "from all claims, demands, and causes of action which FMC ... may have" applies unambiguously to CERCLA liability) (Minn. law). In this case, paragraph VI of the indemnity agreement, *supra,* specifically requires Diamond's compliance with *all* present or *future* laws. The parties clearly intended to cover future unforeseen liabilities. Moreover, when Diamond chose to exercise its option to renew the lease in 1983, CERCLA had already been enacted. Clearly, at that time or in 1985 when the lease was amended, the potential liability for environmental response costs under the lease indemnity provisions existed. I find the indemnity agreement unambiguous and covering environmental claims of the type now at issue in this adversary. Accordingly, plaintiff's motion for summary judgment based on the unenforceability of the lease indemnity provisions is denied.

In denying defendants' motion on enforceability grounds, however, I only address the scope of coverage of the indemnity with respect to the type of legal claim which may be asserted thereunder. I do not address the further question of whether the indemnity provisions serve to hold plaintiff harmless only for the acts of defendants or whether they also serve to hold plaintiff harmless for any contamination for which plaintiff or a third party may be responsible. Plaintiff has not moved for summary judgment and that issue need not be reached here.[12]

Based on the foregoing, it is hereby ORDERED that defendants' motion for summary judgment is granted in part and denied in part. On the issue of defendants' liability

---

12. Not properly before me at this time and not addressed are plaintiff's arguments concerning abandonment of the property and the priority of any claim to which GPA might be entitled under the lease. As defendants' motion only addressed the issue of the debtor's liability under the lease indemnity provisions, the issues of the parties ultimate liability and responsibility for costs under the Georgia hazardous waste statutes, including any rights of contribution as provided for therein, remain for determination in this adversary.

to plaintiff under the lease indemnity provisions, defendants' motion is ORDERED granted to the extent that plaintiff is barred from asserting a default and claim for indemnity for assessment and remediation costs as to any contamination existing on the property pre-assumption. On the issue of the unenforceability of the lease indemnity provisions, defendants' motion is ORDERED denied.