**In re CELLNET DATA SYSTEMS, INC., et al., Debtors.**

No. 00–00844 (PJW).

United States Bankruptcy Court,
D. Delaware.

Aug. 25, 2004.

Margaret Manning, Buchanan Ingersoll P.C., Wilmington, DE, Alan M. Anderson, Christopher K. Larus, Stuart K. Ford, Fulbright & Jaworski L.L.P., Minneapolis, MN, for SchlumbergerSema, Inc.

Howard B. Kleinberg, Meyer, Suozzi, English & Klein, P.C., Mineola, NY, Ian Connor Bifferato, Megan N. Harper, Bifferato, Gentilotti & Biden, P.A., Wilmington, DE, for Northern States Power Company.

### MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This ruling is with respect to the renewed motion (Doc. # 713) of SchlumbergerSema, Inc. ("SLB") seeking an order enforcing a May 4, 2000 order (the "Order") entered in this Chapter 11 case. The Order approved a sale transaction between the Debtor and SLB. SLB seeks such relief in connection with its contractual disputes with Northern States Power Company ("NSP"), which disputes are the subject of pending arbitration.[1] The matter is now before me on remand from the District Court directing me to exercise jurisdiction to determine what claims being asserted by NSP in the arbitration are barred by the Order. As discussed below, I find that certain of the claims asserted by NSP against SLB in the arbitration are barred by the Order.

---

1. NSP is the successor to Xcel Energy, Inc. Any reference to Xcel Energy, Inc. will be treated herein as a reference to NSP.

## BACKGROUND

On February 4, 2000, CellNet Data Systems, Inc. ("CellNet") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* On March 1, 2000, CellNet and SLB entered into an asset purchase agreement (the "Purchase Agreement") by which SLB agreed to purchase substantially all of CellNet's assets. The Court approved the Purchase Agreement by the Order (Doc. # 284).

Pursuant to the Order, CellNet assumed and assigned to SLB specifically identified "Assumed Contracts." These Assumed Contracts were identified in Exhibit A to the Order. A 1996 Data Service Agreement (the "DSA") between CellNet and NSP is one of the Assumed Contracts listed on Exhibit A to the Order. (Doc. # 284, Ex. A at 23.) The Order provides that upon payment of the identified "Cure Amounts," "any and all defaults under the Assumed Leases and Assumed Contracts [were to] be deemed cured in all respects." (Doc. # 284 at 13.) Exhibit A to the Order lists the cure amount for the DSA as "0.00." (Doc. # 284, Ex. A at 23.) The DSA references a DA Transfer Agreement (the "DATA"), a draft of which is appended as Exhibit J to the DSA. (Doc. # 696, Ex. A.) The DATA is not listed on Exhibit A to the Order as one of the "Assumed Contracts".

The Order also states that CellNet's assets were to be transferred to SLB "free and clear of all pre and postpetition claims, and all pre and postpetition encumbrances, obligations, liabilities, law suits, interests, [or] contractual commitments" (Doc. # 284 at 14) related to CellNet's assets other than certain obligations specifically detailed in the Order. The Order goes on to state:

> [SLB] is not a successor to the Debtors or its estate by reason of any theory of law or equity and [SLB] shall not assume or in any way be responsible for any liability or obligation of the Debtors and/or its estate, except as otherwise expressly provided in this Order or the Purchase Agreement.

*Id.* at 15.

\*   \*   \*   \*   \*   \*

> Upon the entry of this Order, all claims against the Debtors with respect to the Assumed Leases and the Assumed Contracts shall be deemed waived.

*Id.* at 21.

The Order also provides that all entities were "permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against [SLB] as alleged successor or otherwise with respect to any Liens arising out of or related to [CellNet's assets]." *Id.* at 15. The Order is "binding in all respects" on "all non-Debtor parties to the Contracts which may be assigned to [SLB] under the Purchase Agreement." *Id.* at 12, 13. Finally, the Court "retain[s] jurisdiction to interpret and enforce the terms and provisions of this Order and the Purchase Agreement, and to adjudicate, if necessary, any and all disputes concerning the assumption and assignment of the Assumed Leases and Assumed Contracts." *Id.* at 11, 12.

The DSA is an agreement by which CellNet agreed to provide automated meter reading services to NSP. Pursuant to Section 3.7.1 of the DSA, NSP and CellNet agreed that "[o]n or shortly after the Implementation Date, NSP and CellNet shall enter into the [DATA], pursuant to which NSP shall transfer ownership of RTU Radios and related equipment currently owned by NSP and used to provide RTU Communications Services to CellNet." (Doc. # 696, Ex. A at 45.) Pursuant to

Section 6.2 of the DSA, NSP and CellNet further agreed that any amounts due under the DATA "shall become due and payable or otherwise effective on the Implementation Date. CellNet shall pay NSP any amount due in the manner set forth in the [DATA] and close on the transfer described in the [DATA] within 20 days of the Implementation Date without further notice or demand by NSP." *Id.* at 80.

The "Implementation Date" referenced in the DSA occurred in September 1997, several years prior to the Order and SLB's taking assignment of the DSA. CellNet never did sign the DATA, pay NSP any amount for the subject equipment, or otherwise close on the DATA. Thus, to the extent that CellNet had any obligations under the DSA to either execute or perform under the DATA, CellNet breached its obligations long before SLB assumed any obligations relating to the DSA and long before the Court ordered that all pre-assignment breaches of the DSA were deemed cured.

NSP appeared in this chapter case nearly two months before the entry of the Order. On March 13, 2000, NSP filed a "Notice of Appearance And Demand For Service Of Papers" through its attorney of record, Bruce A. Colt. (Doc. # 153.) In its notice of appearance, NSP requested that "all notices given or required to be given in the captioned case...be served upon Bruce A. Colt" at NSP's address in Minneapolis, Minnesota. *Id.* In addition, while CellNet's bankruptcy proceeded, NSP engaged in negotiations with SLB to amend the DSA and actually executed an amendment to the DSA with SLB prior to the Order. The Order recites that:

> On March 15, 2000, the Debtors served copies of the Sale Motion, the Purchase Agreement, the Bidding Procedures Order, and the proposed Sale Order, by first-class mail, postage prepaid upon:
>
> \*     \*     \*     \*     \*     \*
>
> all entities who have filed a notice of appearance and request for service of papers in these cases; and
>
> all parties to Assumed Leases and Assumed Contracts proposed to be assumed and assigned under the Purchase Agreement.
>
> On March 15, 2000, the Debtors served copies of the Assumption Notice (as that term is defined in the Bidding Procedures Order) by first-class mail, postage pre-paid upon all non-Debtor parties to Assumed Leases and Assumed Contracts"

(Doc. # 284 at 3, 4.)

At no time prior to the entry of the Order did NSP assert a claim against CellNet or otherwise object to the Purchase Agreement or the Order.

In late 2002, SLB initiated an arbitration proceeding asserting that NSP had breached various post-assumption obligations under the DSA. (Doc. # 713 at 2.) In response, NSP has asserted a number of counterclaims against SLB based, *inter alia*, on its assertion that SLB failed to execute and perform under the DATA. (Doc. # 695, Ex. C.) Thereafter, SLB filed its original motion seeking an order that NSP's arbitration counterclaims are in violation of the Order. (Doc. # 694.)

NSP argues that the only issue for the Court to decide is the general impact of the Order and that the Court need not address each of the counterclaims asserted by NSP before the arbitration panel. (Doc. # 734 at 10.) According to NSP, if the Order has preclusive effect, the degree of preclusion should be left to the arbitration panel. *Id.*

SLB argues that this Court has exclusive jurisdiction to determine "what's in

and what's out," whereby this Court should determine the res judicata effect of the Order and whether the specific counterclaims could have been raised in the bankruptcy proceedings. (Doc. # 733 at 1, 10.) SLB also argues that further briefing is required because of NSP's "new claims," i.e., claims that NSP asserted in the arbitration while the motion before me was on appeal. *Id.* at 10.

Given the District Court's remand order, it is clear that this Court has broad jurisdiction to determine the res judicata effect of the Order, and therefore, I will not defer to the arbitration panel to decide what is barred by the Order. However, I do not believe it is appropriate for the Court to address the "new claims" raised by NSP during the appeal process. It is my understanding that SLB has filed a motion before the arbitration panel seeking to have those new claims denied on procedural grounds. If that motion is successful, then it moots any need for this Court to determine the application of the Order to those new claims. Furthermore, I believe the record is insufficient for me to address those new claims. If those new claims are deemed by the arbitration panel to be properly before it, then SLB is free to file a further motion in this Court seeking a determination as to whether such claims are barred by the Order. Consequently, at this time I will address only the counterclaims addressed by SLB in its renewed motion.

## DISCUSSION

The Order states that upon payment of any cure amounts, "any and all defaults under the [DSA were] deemed cured in all respects." (Doc. # 284 at 13.) The Order found that the cure amount for all alleged breaches under the DSA was "0.00," and that "there [we]re no nonmonetary defaults requiring cure." *Id.* at 23, 7. In addition, the Order decreed that "[SLB] shall not assume or in any way be responsible for any liability or obligation of [CellNet], except as otherwise expressly provided in this Order." *Id.* at 15. Accordingly, the Order expressly enjoined CellNet's claimants, including NSP, from asserting, in any forum, claims arising from CellNet's pre-assignment defaults.

Section 3.7.1 of the DSA required CellNet and NSP to have entered the DATA "[o]n or shortly after the Implementation Date" (Doc. # 696, Ex. A at 45.) Section 6.2 of the DSA further required CellNet and NSP to "close on the transfer described in the [DATA] within 20 days of the Implementation Date without further notice or demand by NSP." *Id.* at 80. This section further provides that the DA Transfer Price became "due and payable or otherwise effective on the Implementation Date." *Id.* It is undisputed that the Implementation Date which triggered each of these obligations to execute or perform under the DATA occurred years before SLB assumed any obligations under the DATA.

When a bankruptcy court approves the assumption of an executory contract, it necessarily finds that no uncured defaults exist. *In Re Lykes Bros. Steamship Co.*, 221 B.R. 881, 883 (Bankr. M.D.Fla.1997) ("If prior to the assumption of any executory contract there is no allegation of any existing default, the order approving the contract determines that no default exists."); *In re Diamond Mfg. Co.*, 164 B.R. 189, 197 (Bankr.S.D.Ga.1994); *NCL Corp. v. Lone Star Bldg. Centers (Eastern), Inc.*, 144 B.R. 170, 179 (S.D.Fla. 1992). Thus, "[t]he nonbankrupt party [to an executory contract] bears [the] burden to assert any defaults prior to the assumption." *In re Diamond Mfg. Co.*, 164 B.R. at 199. Where the nonbankrupt party has knowledge of facts sufficient to place the

party on notice that a "potential" pre-confirmation breach has occurred, res judicata bars that party from later asserting a claim based upon the pre-petition breach. *Id.* at 201.

■ NSP was aware, or reasonably should have been aware, of CellNet's pre-petition failure to execute and perform under the DATA. NSP had notice that SLB intended to assume the DSA from CellNet and that the cure amount was represented to be zero. Notwithstanding appropriate notice to NSP, it elected not to object to the zero cure amount and the deemed cure determination. Whether through neglect (which it has not asserted) or conscious decision making (which it has not asserted), or some other unexplained reason, NSP allowed the CellNet/SLB transaction to go forward with the consequences dictated by the Order.

NSP is not allowed to simply sit back while this Court confirmed SLB's assumption of the DSA and then seek to assert against SLB claims based upon CellNet's pre-petition conduct. *Id.* at 199. Rather, the cases are clear that NSP's purported claim for pre-assumption defaults is barred by the Order under the doctrine of res judicata. *See NCL Corp. v. Lone Star Bldg. Centers (Eastern), Inc.,* 144 B.R. at 180; *see also In re USN Communications, Inc.,* 280 B.R. 573, 586 (Bankr.D.Del.2002) ("The doctrine of *res judicata* (or claim preclusion) precludes a party from relitigating claims that were or could have been asserted in a prior action."); *In re Mariner Post–Acute Network, Inc.,* 267 B.R. 46, 52 (Bankr.D.Del.2001); *CoreStates Bank, N.A. v. Huls America, Inc.,* 176 F.3d 187, 194 (3d Cir.1999).

**2.** Section 16.8 of the DSA provides that it shall be interpreted and governed by Minne-

■ In the arbitration proceeding NSP has asserted four separate breaches of contract by SLB which arise from SLB's alleged failure to execute or perform under the DATA. Specifically, the counterclaims allege, *inter alia*, that SLB breached the DSA by failing to: (1) execute the DATA; (2) "close on the asset transfers set forth in the [DATA] per Section 3.7.1 and Appendix J to the DSA;" (3) pay "the DA Transfer Price under the [DATA] per Section 3.7.1 and Appendix J to the DSA;" and (4) pay interest due on the DA Transfer Price, plus maintenance and other costs related to the DA Transfer Equipment (hereinafter collectively referred to as the "DATA Breaches"). (Doc. # 695, Ex. C at, e.g., 16–17 (¶¶ 19–22).)

NSP's first counterclaim asserts a breach of contract, alleging, *inter alia*, the DATA Breaches. Under applicable Minnesota law, as with the law of other jurisdictions, NSP's claims for breach of contract arose when CellNet allegedly breached its obligations to execute and tender payment under the DATA.[2] *See Parkhill v. Minnesota Mutual Life Ins. Co.,* 174 F.Supp.2d 951, 956 (D.Minn.2000); *Levin v. C.O.M.B. Co.,* 441 N.W.2d 801, 803 (Minn.1989) ("[I]t has long been settled that a cause of action for breach of contract accrues on the breach of the terms of the contract."). The plain language of the DSA clearly fixes the date of CellNet's alleged breach at a specific point in time—the Implementation Date. It is undisputed that this date occurred years before SLB assumed the DSA. Clearly, if such a breach occurred, it was not a breach committed by SLB because SLB did not assume any obligations under the DSA until May 2000.

sota law. (Doc. # 696, Ex. A at 139.)

In order to avoid the obvious impact of the Order, NSP asserts that its breach of contract counterclaims are based on SLB's failure to satisfy some unidentified ·and continuing contractual obligation to execute and perform under the DSA. This argument is not supported by either the language of the DSA or Minnesota law. The DSA clearly linked CellNet's obligations with respect to the DATA to a specifically defined trigger date—the Implementation Date.

Courts have uniformly rejected attempts to characterize alleged breaches of contract accruing at fixed points in time as "continuing" breaches. *See, e.g., West v. ITT Continental Baking Co.,* 683 F.2d 845, 846 (4th Cir.1982) (holding that employee's cause of action for breach of a collective bargaining agreement accrued when employee was forced to become an independent contractor and that his time spent as an independent contractor was not a continuing violation of the contract); *Press v. Howard University,* 540 A.2d 733, 735 (D.C.1988) (holding that plaintiff's claim for wrongful suspension accrued on the date that he was suspended and was not a continuing breach of contract throughout the period of his suspension). Courts have similarly rejected the argument that the failure to correct a previous breach constitutes another breach. *See, e.g., Kyriakopoulos v. George Washington University,* 866 F.2d 438, 448 (D.C.Cir.1989).

The rationale behind these cases is easy to understand. If the failure to perform, or failure to cure the nonperformance of, a defined contractual obligation at some fixed point in time were characterized as a "continuing" breach, the non-breaching party would be able to avoid the impact of any applicable statute of limitations during the term of the contract. *West v. ITT Continental Baking Co.,* 683 F.2d at 846 (continuing violation theory would "destroy the policies of finality and repose underlying the statute of limitations"); *Fitzgerald v. Seamans,* 553 F.2d 220, 230 (D.C.Cir. 1977) ("[T]he mere failure to right a wrong and make plaintiff whole cannot be a continuing wrong which tolls the statute of limitations, for...the exception would obliterate the rule.").

■ If the failure to execute the DATA was a breach of the DSA, it was a breach by CellNet that occurred on or shortly after the Implementation Date. SLB did not inherit an ongoing obligation to remedy CellNet's alleged breach when it assumed the DSA in May 2000, nor does SLB's failure to execute the DATA constitute a continuing breach of the DSA. As noted above, the Order specifically decreed that SLB "is not a successor to the Debtors or its estate by reason of any theory of law or equity and [SLB] shall not assume or in any way be responsible for any liability or obligation of the Debtors and/or its estate." (Doc. # 284 at 15.) Accordingly, any claim that the failure to execute or perform under the DATA constitutes a breach of the DSA arose before SchlumbergerSema acquired CellNet's assets and is now barred by the Order.

NSP is barred from asserting claims against CellNet based on acts or omissions that occurred prior to May 2000. Likewise, NSP is barred from asserting claims against SLB based upon those same acts or omissions. Obviously, since SLB and NSP had no dealings prior to May 2000 (other than the unrelated amendments designed to take effect upon assumption) there is no basis for NSP to assert a claim against SLB based on SLB acts or omissions prior to that date.

After May 2000, SLB's obligations to NSP are dictated by the terms of the DSA as modified by the Order which decreed that any defaults under the DSA, an assumed contract, are "deemed cured in all

respects." (Doc. # 284 at 13.) The effect of that decree was a determination that CellNet was excused from performance, i.e., CellNet no longer had an obligation to sign the DATA, to take title to the subject equipment, or to pay for it. As assignee of the DSA, SLB likewise has no obligation to sign the DATA, to take title to the subject equipment, or to pay for it. Consequently, I conclude that as to the first counterclaim, NSP is barred by the Order from seeking any recovery based on the DATA Breaches.

The second counterclaim, alleging breach of covenant of good faith and fair dealing, also includes specific allegations of the DATA Breaches.

■ However, Minnesota law "does not recognize a cause of action for breach of a covenant of good faith and fair dealing independent from an underlying breach of contact claim." *International Travel Arrangers v. NWA, Inc.,* 723 F.Supp. 141, 153 (D.Minn.1989); *see also Orthomet, Inc. v. A.B. Med., Inc.,* 990 F.2d 387, 392 (8th Cir.1993) (under Minnesota law, a cause of action for good faith and fair dealing cannot exist independent of the underlying breach of contract claim); *Larson v. Vermillion State Bank,* 567 N.W.2d 721, 724 (Minn.Ct.App.1997)(covenant of good faith and fair dealing does not impose duties separate from express terms of agreement).

For the reasons stated above, the contract provisions giving rise to the DATA Breaches have no application to SLB. They have been superceded by the provisions of the Order. Consequently, to the extent that the second counterclaim is premised on the DATA Breaches, that counterclaim is barred by the Order.

NSP has alleged a counterclaim for promissory estoppel (third counterclaim). While this counterclaim does not specifically recite the DATA Breaches, it does in-

corporate all of the preceding allegation paragraphs of the counterclaims, thereby effectively incorporating the DATA Breaches into the third counterclaim. The Order bars NSP from asserting a promissory estoppel claim based on the DATA Breaches.

Absent a complete record before me of SLB's conduct in discussing with NSP the absence of the transfer of the equipment and the payment for same, I do not opine that a promissory estoppel claim based *solely* on post-assignment conduct is barred by the Order. For example, if, post May 2000, SLB concluded that it would be in its best interest to own the subject equipment and SLB explicitly stated to NSP its commitment to purchase the equipment and NSP in reliance upon that promise changed positions to its detriment, then based solely on that post May 2000 conduct and without regard to the DATA Breaches, it may be possible for NSP to recover on a promissory estoppel theory.

The sixth counterclaim, based on unjust enrichment, specifically alleges the DATA Breaches. In pursuing the unjust enrichment count, NSP is barred from asserting the DATA Breaches. That bar includes (a) any assertion of any benefit that may have accrued to SLB by reason of NSP's failure to assert a claim against CellNet for pre-assignment breaches, or (b) any consideration of the inability of NSP to pursue contractual claims against CellNet or SLB by reason of the Order.

Like the third counterclaim, the fourth counterclaim (for declaratory judgment) and the fifth counterclaim (for an accounting) incorporate all of the preceding allegation paragraphs of the counterclaims, thereby effectively · incorporating the DATA Breaches into these two counterclaims. Furthermore, the declaratory judgment counterclaim alleges a failure of

SLB to cure defaults set forth in NSP's September 9, 2002 default notice, which notice includes assertions of the DATA Breaches. Consequently, to the extent the fourth and fifth counterclaims are premised on the DATA Breaches, these counterclaims are barred by the Order.

## CONCLUSION

For the foregoing reasons, an order will be entered which bars NPS from asserting any of the DATA Breaches as a basis for any recovery against SLB in the arbitration proceeding.

## ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date, the Renewed Motion of SchlumbergerSema, Inc. for an Order Enforcing This Court's May 4, 2000 Order and Injunction (Doc. # 713) is **GRANTED**. This Court's order of May 4, 2000 (Doc. # 284), as it relates to the 1996 Data Service Agreement between CellNet Data Systems, Inc. and Northern States Power Company, bars Northern States Power Company from seeking recovery against SchlumbergerSema, Inc. based, in whole or in part, on any of the "DATA Breaches" (as that term identifies matters addressed in the Memorandum Opinion).